IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No.  09-233 |
| | ) |
| 275.81 Acres of Land, More or Less, | ) |
| Situated in Stonycreek Township, | ) |
| Somerset County, Commonwealth of | ) |
| Pennsylvania, and Svonavec, Inc. | ) |
| | ) |
| Defendant. | |

AMBROSE, Senior District Judge

# OPINION
# AND
# ORDER OF COURT

The factual and procedural details of this condemnation action are well known to the parties and I need not repeat them in detail here.  In short, the United States of America filed a Complaint for Condemnation on September 1, 2009, for the taking of property under the power of eminent domain and for the ascertainment and award of just compensation to the owners and parties in interest.  (Docket No. 1).  The subject property consists of 275.81 acres of land owned at the time of taking by Defendant, Svonavec, Inc., and located in Stonycreek Township, Somerset County, Pennsylvania.  This site includes approximately six acres of land on which United Airlines Flight 93 crashed on September 11, 2001.  The United States acquired a fee simple estate in the 275.81 acres subject to existing easements and certain rights of third parties.  See Docket No. 1.  The public use for which the property was taken was for the administration, preservation, and development of a Flight 93 National Memorial.  Id.  Svonavec, Inc. has requested a jury trial on the issue of just compensation.  (Docket No. 21).

Pending are four Motions in Limine.  The United States offers the expert testimony of appraiser Gregory Jones ("Jones") on the issue of valuation of the subject property.  Pending is

1

Defendant's Motion in Limine seeking to exclude Jones' proposed testimony on the grounds that his methodology is unreliable. (Docket No. 104). Defendant offers the expert testimony of appraiser Randall Bell in support of its valuation of the subject property. The United States has filed three motions in limine seeking to preclude portions of Bell's testimony and/or materials on which Bell relied to support his opinions. (Docket Nos. 103, 105, 106). The parties have represented that a hearing is not necessary on these issues. Thus, I base my decision on the parties' submissions and attachments thereto. See Oddi v. Ford Motor Co., 234 F.3d 136, 154-55 (3d Cir. 2000). For the reasons set forth below, the Motions in Limine are denied.

## I. Applicable Standards

### A. *Daubert* Standard and Rule 702

In Daubert, the Supreme Court held that:

> [f]aced with a proffer of expert scientific testimony, ... the trial court judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Daubert v. Merrell Dow Pharm., Inc. 509 U.S. 579, 592-93 (1993). More recently, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), the Supreme Court clarified any confusion regarding the intended reach of the Daubert decision, by declaring that the trial judge must perform this "basic gatekeeping obligation" to all expert matters, not just "scientific" matters. In the Third Circuit, the trial court's role as a "gatekeeper" announced in Daubert requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must ⬜fit⬜ the facts of the case. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994). Thus, pursuant to Daubert, the gatekeeping function requires the court to ensure that the expert testimony is both reliable and relevant. Daubert, 509 U.S. at 589; Kumho Tire Co., 526 U.S. at 147.

As to the first requirement - qualification - the Court of Appeals for the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more general qualifications." Paoli, 35 F.3d at 741. "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts." Id. Thus, an expert can qualify based on a broad range knowledge, skills, of training and experience.

The second inquiry focuses on methodology. The inquiry into methodology is designed to ensure that an expert's opinions are based upon "'methods and procedures of science' rather than on subjective belief or unsupported speculation." Id. at 742. Factors used to assess reliability include whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses. See Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594 (D.N.J. 2002), aff'd, 68 F. App'x 356 (3d Cir. 2003). "Some courts also consider additional factors relevant in determining reliability, including: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation . . . ; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. . . ; (iii) whether the expert has adequately accounted for alternative explanations . . . ; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context . . . ; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert . . . ." Id. at 594-95 (citations omitted); see also Cuffari v. S-B Power Tool Co., 80 F. App'x 749, 751 (3d Cir. 2003) ("In short, trial courts should determine whether the expert's conclusion is based on valid reasoning and reliable methodology.").

Although this list of factors is lengthy, not each factor will be relevant to every reliability analysis. The "test of reliability is 'flexible.'" Kumho, 526 U.S. at 141. According to the Supreme Court, "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts." Id. The relevance of the Daubert factors depends "on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. at 150 (internal quotation marks and citations omitted).

Finally, Daubert and Rule 702 require that the expert's testimony "fit" the facts of the case. "'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." Magistrini, 180 F. Supp. 2d at 595 (citing Paoli, 35 F.3d at 743).

### B. Eminent Domain – Just Compensation

Rule 71.1 of the Federal Rules of Civil Procedure governs federal eminent domain proceedings in district courts. Fed. R. Civ. P. 71.1. As set forth in Rule 71.1(h), the court in a federal eminent domain action tries all issues including compensation, except that compensation may be determined by a jury when a party demands one.[1] Thus, legal and factual issues other than just compensation, including disputes over title to the land at issue, are for the court to decide. See United States v. Reynolds, 397 U.S. 14, 19-20 (1970).

The United States has the authority to take private property for use by eminent domain, provided that it satisfies its Fifth Amendment obligation to provide "just compensation" to the owner thereof. United States v. 6.45 Acres of Land, 409 F.3d 139, 145 (3d Cir. 2005) (quoting Kirby v. Forest Indus., Inc., 467 U.S. 1, 9 (1984)). "In general, 'just compensation' means 'the fair market value of the property on the date it is appropriated.'" Id. "The guiding principle of just compensation . . . is that the *owner* of the condemned property must be made whole but is not entitled to more." Id. at 145 n.11 (quoting United States v. 564.54 Acres of Land, 441 U.S.

---

[1] Under Rule 71.1(h)(1), compensation must be determined "by a jury when a party demands one . . . unless the court appoints a commission." Fed. R. Civ. P. 71.1(h)(1)(B). The procedure for appointing a commission in lieu of a jury is set forth in Rule 71.1(h)(2).

506, 516 (1979) (emphasis in original)).  It is the landowner's burden to establish just compensation. Id.

Fair market value is determined by considering the subject property's "highest and best use." Specifically, the just compensation clause requires that "condemnees receive the value of the highest and best use for which the property is adaptable in the reasonably near future from the vantage point of the date of the taking." United States v. 68.94 Acres of Land, 918 F.2d 389, 393 (3d Cir. 1990) (citing Olson v. United States, 292 U.S. 246, 255 (1934)).  Although the factfinder should not entertain mere speculative uses of the property, "evidence of a potential use should not be excluded merely because it depends upon the existence of extrinsic conditions." Id.

"Expert opinion testimony acquires special significance in an eminent domain proceeding where the sole issue is the value of condemned property." Id.  As the Court of Appeals for the Third Circuit has cautioned:

> Since there are no infallible means for determining with absolute conviction what a willing buyer would have paid a willing seller for the condemnees' property at the time of taking, eminent domain proceedings commonly pit the Government's valuation experts against those of the landowner.  Thus, the exclusion of one or all of either party's proposed experts can influence substantially the amount of compensation set by the factfinder.  Not only does the landowner have a strong interest in receiving just compensation for property, the public as well has vested interests in insuring that the Government does not pay more than what the owner justly requires.  Recognizing the critical role of expert witnesses in these cases and the strong interest on both sides that the compensation be just, trial courts should proceed cautiously before removing from the jury's consideration expert assessments of value which may prove helpful.

Id.

## II.   Analysis

### A.   Defendant's Motion in Limine – Docket No. 104

The United States offers the expert testimony of appraiser Gregory Jones.  In a report dated November 23, 2010, Jones opines that there were "not one, but several possible highest and best uses of the property, possibly in combination."  See Docket No. 104, Ex. B; see also

5

Docket No. 110-3 (Jones Report at 29).[2]  He states that among the most probable and feasible uses for about 94% of the site were the ones seen throughout rural Somerset County, including open space used for cropland, grazing, hunting and recreation, farmettes, and large-tract home sites.  Id.  He also acknowledges that several acres in the immediate vicinity of the Flight 93 impact site "are likely to be left undisturbed in perpetuity, in memoriam as sacred ground."  Id.  Although Jones states in his report that a private Flight 93 museum might be among the property's possible higher and better uses, he concludes that there was inadequate support to determine that use to be financially feasible.  Id.  Jones' report ultimately concludes that the property had an estimated unit value of $2,200 per acre for a total final estimate of value of $600,000 as of the date of the taking, September 9, 2009.  See Docket No. 110-4 at 7 (Jones Report at 50); Docket No. 104-2.

Defendant moves in limine to exclude Jones' expert testimony.  (Docket No. 104). Defendant does not challenge Jones' qualifications as an expert.  Rather, he argues that Jones' appraisal methodologies are flawed and inherently unreliable.  See Docket No. 104.  All of Defendant's arguments challenge Jones' "highest and best use" analysis.  Specifically, Defendant contends that (1) Jones ignores the subject property's use as a private memorial at the date of the taking; (2) Jones' attempts to discount the feasibility of operating a private memorial on the property are futile and ill-founded; and (3) Jones fails to cite any reliable support for his own highest and best use conclusion.  Docket No. 104 at 3.

The parties agree that the appropriate "highest and best use" analysis is that set forth by the Appraisal Institute, a global association of professional real estate appraisers.  See Docket No. 104 at 7; Docket No. 105, Ex. 19 (Stephen F. Fanning, *Market Analysis for Real Estate: Concepts and Applications in Valuation and Highest and Best Use*).  Using these standards, the

---

[2] A copy of Jones' Report is attached as Exhibit 2 to the United States' Response in Opposition to Defendant's Motion.  See Docket No. 110-2 and 110-3.  Portions also are attached as Exhibit B to Defendant's Motion.  See Docket No. 104-2.

6

highest and best use analysis consists of a four step process. That is, an appraiser must determine what uses are: (1) physically possible; (2) legally permissible; (3) of the alternative uses that are both physically possible and legally permissible, which uses are financially feasible; and (4) of the financially feasible uses, which use is maximally productive. See id. As the foundation for a thorough investigation of the competitive position of the property in the minds of market participants," it is "critical that a careful highest and best use analysis precede the application of the approaches to value." The Appraisal of Real Estate 13th ed. (Docket No. 105, Ex. 1).

Defendant's argument that Jones engaged in a flawed highest and best use analysis requiring exclusion of Jones' expert testimony is without merit. First, contrary to Defendant's argument, Jones did not ignore the property's use or potential use as a private memorial. In this regard, I note that the parties dispute whether and/or to what extent the property was being used as a private Flight 93 memorial as of the date of the taking. Nevertheless, Jones' analysis included a thorough investigation into the potential use of a private memorial on the property. After a detailed evaluation of this issue, Jones concluded that although a private memorial was a potential highest and best use, he could not deem that use to be financially feasible due to the many unknown variables, risks, and uncertainties he found to be inherent in such a use. See Jones Report (Docket No. 110-2, 110-3) at 21-29. To the extent Defendant disagrees with Jones' conclusions regarding the financial feasibility of operating a private memorial on the property, such matters go to the weight, not the admissibility, of Jones' testimony. Defendant is free to attack Jones' conclusions on cross-examination or to introduce appropriate competing evidence at trial.[3]

---

[3] Jones' alleged failure to mention the federal statute establishing the Flight 93 crash site as a public memorial (see Docket No. 104, at 4) is not fatal to his analysis. As the United States Supreme Court has held, a highest and best use analysis focuses on the uses a private owner might reasonably develop or enjoy, not the demand or use for which the government acquired the property. See United States v. Cors, 337 U.S. 325, 333 (1949); United States v. 320 Acres of Land, 605 F.2d 762, 801 n.107 (5th Cir. 1979). Thus, the appropriate focus is the feasibility of using the land as a *private*, not public, memorial.

Defendant's argument that Jones fails to cite any reliable support for his own highest and best use conclusion is likewise unfounded. As set forth above, Jones methodically evaluated each of the elements of the highest and best use analysis in his report. He also analyzed the subject property's market, including uses of surrounding properties; and reviewed the property's history and condition, including recognizing the Flight 93 crash site as "hallowed ground to be treated with reverence." Jones Report (Docket No. 110-2, 110-3) at 16-29. Although Defendant points out supposed deficiencies in Jones' analysis such as Jones' deposition testimony that he talked to a county official who indicated it was difficult to raise crops on reclaimed mine lands, those attacks are appropriate topics for cross-examination, not exclusion.

In short, I disagree that the highest and best uses that Jones proposes are speculative uses that should be excluded from consideration by the trier of fact. As the United States aptly notes, the fact that Jones arrived at a different highest and best use conclusion than Defendant would like is not a basis for excluding Jones' opinion. Defendant's disagreement with and/or perceived weaknesses inherent in Jones' highest and best use analysis are matters of weight, not admissibility. For all of these reasons, Defendant's Motion in Limine (Docket No. 104) is denied.

### B. Plaintiff's Motion to Exclude Defendant's Highest and Best Use of the Subject Property as a Memorial and Related Visitor Center – Docket No. 105

Defendant offers the expert testimony of Randall Bell in support of its valuation of the subject property. Among other things, Bell opines in his appraisal report that the highest and best use of the property is as a private memorial and related visitor center. Docket No. 114-1, at 6 (12/15/2011 Bell Report at 27). Using the land residual valuation approach, Bell ultimately estimates the market value of the subject property to be $23,300,000. Id. at 3; Docket No. 105-6, at 21 (12/15/2011 Bell Report at 40). This value far exceeds the government's expert's value

estimate of $600,000. The United States moves to exclude all or part of Bell's testimony on several grounds. In the instant motion, the government attacks Bell's highest and best use conclusion and urges me to exclude Bell's highest and best use testimony on the grounds that he improperly based the conclusion on speculative and unfounded assumptions. Docket No. 105, at 1; see also id. at 2 (arguing the "fundamental flaw in Mr. Bell's analysis is his reliance upon a preconceived highest and best use conclusion that lacks adequate support"). The government alleges that Bell failed to apply the required highest and best use analysis and, thus, failed to meet its burden to show that it was reasonably probable that a financially feasible privately operated memorial and visitor's center could be developed on the property. Id. at 2-3.

After careful consideration I disagree that Bell engaged in such a flawed highest and best use analysis that I must exclude this aspect of his expert testimony. As set forth above, the parties agree that the appropriate highest and best use analysis is the four step process set forth by the Appraisal Institute; i.e., the appraiser must determine what uses are: (1) physically possible; (2) legally permissible; (3) of the alternative uses that are both physically possible and legally permissible, which uses are financially feasible; and (4) of the financially feasible uses, which use is maximally productive. See supra Section II.A.

Contrary to Plaintiff's assertions, Bell discusses all four of these factors in his report. Docket No. 105-6, at 8 (Bell Report at 27). Although the report does not describe in detail the bases for Bell's conclusions under the analysis, Defendant explains that the report is a "Summary Appraisal Report," and, as such, does not require the level of detail the government urges. Def.'s Br. Opp. (Docket No. 112) at 10-11; see also Def.'s Suppl. Ex. A (Docket No. 114-1, at 2-3).[4] Defendant states that, in accordance with relevant appraisal standards, the data necessary to support Bell's highest and best use conclusion is contained in Bell's workfile

---

[4] Specifically, Defendant cites the Uniform Standards of Professional Appraisal Practice, under which a Summary Appraisal Report is an acceptable option. Def.'s Br. Opp. (Docket No. 112) at 11-12 & Def.'s Suppl. Ex. F (Docket No. 114). Defendant also attaches excerpts from the Uniform Appraisal Standards for Federal Land Acquisitions indicating that a Summary Appraisal Report is one of two acceptable written reporting options. Id. Ex. G.

related to the appraisal. Def.'s Br. Opp. (Docket No. 112) at 12; see also Docket Nos. 115-117 (selections from Bell's workfile).

Although Plaintiff contends that Bell relies solely on a preconceived notion of highest and best use as a memorial and visitor's center without any consideration of market elements or other uses, the record does not support this conclusion. As an initial matter, I agree with Plaintiff that Congress's establishment of a public Flight 93 national memorial alone is an improper basis for a highest and best use determination. Although the historical significance of the crash site cannot be ignored, the highest and best use analysis must, as set forth above, focus on the uses a private owner might reasonably develop or enjoy and not the demand or use for which the government acquired the property. See Cors, 337 U.S. at 333; 320 Acres of Land, 605 F.2d at 801 n.107; see also id. at 783 n.26 ("[I]n determining the fair market value of condemned property, the use which the Government proposes to devote the property to should not be considered unless private owners could also reasonably devote the property to that use."). Thus, the appropriate focus is the feasibility of using the land as a *private*, not public, memorial.

Nevertheless, the record makes clear that the creation of the public Flight 93 national memorial was not the only basis for Bell's conclusions. To the contrary, Bell testified under oath that he conducted voluminous research and considered numerous factors related to financial feasibility, including case studies of other memorials, alternative uses such as agriculture and wind farms, and information from the National Park Service. Bell Dep. (Docket No. 105-8) at 35, 122-27. Among other things, Bell's workfile includes portions of a March 12, 2008 Appraisal Report of the property prepared by LECG for the National Park Service in which the appraiser concludes that the highest and best use of the property is a privately owned and operated memorial dedicated to the passengers of Flight 93. Docket No. 116-1, at 21-30.[5] There is also

---

[5] To the extent Plaintiff's expert Jones has disagreed with the LECG highest and best use analysis, that disagreement goes to the weight, not the admissibility, of Defendant's evidence.

evidence, although disputed by Plaintiff, that Defendant was operating a temporary private memorial on the site at the time of the taking.

In short, I disagree that Defendant's proposed highest and best use of the property as a private memorial and visitor's center is a merely speculative use subject to exclusion at trial. In so concluding, I do not find that Plaintiff's criticisms of Bell's highest and best use analysis are without merit. Rather, those criticisms go to the weight, not the admissibility, of Bell's highest and best use testimony.[6] Plaintiff remains free to expose any weaknesses in Bell's analysis through proper cross-examination or contrary evidence at trial.

For all of these reasons, Plaintiff's motion to exclude Bell's highest and best use testimony is denied.

**C.  Plaintiff's Motion to Exclude Defendant's Use of Certain Studies Employed by Defendant's Appraiser Randall Bell as Irrelevant Under Federal Rule of Civil Procedure 71.1 and Federal Rules of Evidence 402 and 403 – Docket No. 103**

The United States moves to exclude Defendant's use of (1) memorial case studies prepared by appraiser Bell; and (2) a visitation study prepared for the National Park Service and adopted by Bell. (Docket No. 103). Bell cites the memorial case studies as support for income and expense variables in valuing a private memorial and visitor's center on the subject property, and cites the visitation study as a basis for visitation numbers at such memorial. The United States argues that both studies are "wholly incomparable" to the subject property and, therefore, are irrelevant. The United States further contends that the studies are excludable under Rule 403 on the grounds of prejudice, confusion, and waste of time, because Bell allegedly misuses the underlying data, especially the expense ratios from the memorial case studies. Docket No. 103 at 1-2.

Relevant evidence is defined as evidence "having any tendency to make the existence

---

[6] Plaintiff's allegations regarding Bell's financial interest in the subject property also go to the weight, not admissibility, of Bell's testimony. See Pl.'s Br. (Docket No. 105) at 6-9.

of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  In turn, relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  "Rule 403 authorizes a district court in its broad discretion to exclude collateral matters that are likely to confuse the issues." United States v. Casoni, 950 F.2d 893, 919 (3d Cir. 1991).  The inquiries under Rules 401 and 403 are fact-intensive, and context-specific. Sprint v. Mendelsohn, 552 U.S. 379 (2008).  A court should be wary of excluding evidence *in limine* under Rule 403 because "[a] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence." In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 859 (3d Cir. 1999).  "[W]hen the trial judge is in doubt, Rule 403 requires admission." Coleman v. Home Depot, Inc., 306 F.3d 1333, 1344 (3d Cir. 2002) (quoting United States v. Krenzelok, 874 F.2d 480, 482 (7th Cir. 1989)).  The burden of establishing the admissibility and relevance of evidence rests on the proponent. See, e.g., Phillips v. Potter, Civ. A. No. 7-815, 2009 WL 2588830, at *1 (W.D. Pa., Aug. 19, 2009).

With respect to the case studies of other memorials and visitor's centers that Bell uses in his valuation analysis, the Motion in Limine is denied.  As part of his valuation analysis and appraisal of the subject property, Bell prepared twenty case studies of various memorials across the United States. See Pl.'s Mot. Ex. 1 (Docket No. 103-1) at 7-18 .  Bell used the case studies to, *inter alia*, derive inputs for different variables in his income valuation approach, including average admission rate, bookstore/concession income, and rate of visitors paying admission. See id.  The United States attacks the relevancy of the case studies, claiming that they represent an improper "apples to oranges" comparison of the subject property to dissimilar memorials.  Docket No. 103 at 6-17.  Defendant disagrees, pointing out the thoroughness of Bell's case study analysis and arguing that Bell did engage in an "apples to apples" comparison

12

using the best available comparators. Docket No. 111 at 8-11. After careful review, I find that, in the context of this case, whether Bell's case studies are "apples" or "oranges" is a disputed issue of fact, and that Plaintiff's relevancy arguments properly go to the weight, not the admissibility, of the evidence.[7]

With respect to the visitation study prepared for the National Park Service to which the United States objects, the Motion in Limine is likewise denied. The United States complains that the visitation study is irrelevant because it relates to the public Flight 93 memorial, and not a private memorial. Although the visitation study undoubtedly was prepared for the public memorial site, the government has not satisfactorily explained why the projected visitation numbers contained therein are unique to a public memorial. I agree with the United States that the use to which the Government proposes to devote the property should not be considered in determining highest and best use or fair market value. This principle, however, does not mean that evidence concerning projected visitation numbers for a memorial is irrelevant simply because the numbers were prepared for a public memorial. To the extent the United States can show that the public/private distinction makes a difference in this regard, it can demonstrate this point to the fact finder through appropriate evidence and cross examination at trial.

To the extent the United States separately contends that admitting the case and/or visitation studies would unfairly prejudice the government, I disagree. The United States suggests that admission of the studies would be unfairly prejudicial because the studies would confuse the jury and it would waste the Court's time to force the United States to address (and thus give false credence to) them. See Docket No. 103. This argument is without merit. As set forth above, the United States understates the potential relevance of the studies. Even if the probative value is minimal, however, I disagree that the studies will cause undue confusion or delay.

---

[7] To the extent that this motion also attacks the reliability of Bell's application of the case studies to the valuation of the subject property, the motion is denied for the reasons set forth in Section II.D, infra.

For all of these reasons, Plaintiff's motion to exclude Defendant's use of the case studies and visitation study is denied.

### D. Plaintiff's Rule 71.1(h) Motion to Exclude the Valuation Testimony of Defendant's Appraiser Randall Bell – Docket No. 106

The United States seeks to exclude Randall Bell's valuation testimony as unreliable under the principles set forth in Daubert and its progeny. Specifically, the United States argues that Bell: (1) improperly used an income approach – the land residual technique – to determine the land's market value; (2) misapplied the land residual approach, leading him to value a hypothetical operating business that did not exist on the property as of the date of the taking; and (3) used unsupported and speculative data in his valuation. Pl.'s Br. (Docket No. 106) at 1-2.[8] Although I do not disagree with the government that Bell's valuation analysis has its share of weaknesses, I find that those weaknesses are not fatal to Bell's testimony at this juncture.

First, to the extent the United States suggests that Bell's testimony fails simply because he employs an income approach instead of a sales comparison approach, such argument is without merit. Although the sales comparison approach[9] "has been described as the best evidence of market value," see, e.g., United States v. 60.14 Acres of Land, 362 F.2d 660, 665 (3d Cir. 1966), there are several accepted ways to value real property, including income capitalization. See, e.g., Nat'l Food & Beverage Co. v. United States, 105 F. Cl. 679, 701 (Fed. Cl. Ct. 2012) (noting that the three primary valuation methods include the cost approach, the income approach, and the sales comparison approach); see also The Appraisal of Real Estate 13th ed., at 130, 140 (Docket No. 106-8). The valuation approach employed depends on the

---

[8] The United States does not seek to exclude testimony regarding Bell's alternative comparable sales analysis. See Pl.'s Br. (Docket No. 106) at 1, n.1; see also Docket No. 103-1 at 23-27 (Bell's comparable sales analysis).

[9] The sales comparison approach involves collecting data from the sales of similar parcels of land and then analyzing, comparing, and adjusting the data to provide a value for the land being appraised. In contrast, the income capitalization approach involves analyzing the property's capacity to generate future benefits and capitalizing the income to indicate present value. See The Appraisal of Real Estate 13th ed., at 140-142 (Docket No. 106-8).

type of property, the intended use of the appraisal, the identified scope of work, and the quality and quantity of data available for analysis.  Alternatives to the sales comparison approach are particularly appropriate in the absence of adequate comparable sales.  See, e.g., United States v. 1,629.6 Acres of Land, 360 F. Supp. 147, 151 (D. Del. 1973), aff'd in part, rev'd in part on other grounds, 503 F.2d 764 (3d Cir. 1974); United States v. 819.98 Acres of Land, 78 F.3d 1468, 1471 (10th Cir. 1996).[10]

Here, Defendant argues that the events of September 11, 2001, rendered the subject property unique and, therefore, comparable sales are not available.  In other words, the crash of Flight 93 imbued the subject property with a national significance and intrinsic value that is neither transferable nor comparable to otherwise similar parcels.  See Def.'s Br. Opp. at 9-10 and Ex. I (Bell Dep. testimony).  The United States does not address this argument directly, stating only that, but for the Flight 93 crash, the subject property is similar to other area properties.  See, e.g., Jones Dep. at 195-196 (Docket No. 114-11, Def.'s Ex. L).  Statements such as this, however, imply that the crash may differentiate the property from surrounding tracts.  Whether and/or how the pre-taking crash of Flight 93 impacted the value of the subject property as compared to other neighboring properties is a topic more properly explored via evidence and testimony at trial.

The United States also argues that Bell further erred by utilizing a "direct capitalization" income approach, rather than a "yield approach," because "the subject property was not operating on a stabilized – consistent and income producing – basis on the date of value."  Pl.'s

---

[10] As set forth above, Bell's appraisal report also contains a sales comparison analysis. See Docket No. 103-1 at 23-27. The United States cites this comparable sales analysis (which interestingly results in a higher valuation of the property than his income approach) as support for its argument that the Bell's income analysis is improper.  That argument is unpersuasive at this juncture.  As an initial matter, the record is woefully underdeveloped concerning Bell's sales comparison analysis as opposed to his income capitalization analysis.  Moreover, Defendant strongly argues that truly comparable sales are not available.  The Appraisal of Real Estate text also notes that appraisers may use one *or more* approaches to determine value.  The Appraisal of Real Estate 13th ed. (Docket No. 106-8) at 130.  For all of these reasons, I cannot conclude that Bell's inclusion of a comparable sales analysis in his report is tantamount to an admission that comparable sales exist and, therefore, that an income approach is improper.

15

Br. Supp. (Docket No. 106) at 11-14.[11]  Because there was no income-producing visitors' center and memorial operating on the property at the time of the taking, the United States contends that the land residual approach was inapplicable.  See id.  This argument does not necessitate exclusion of Bell's testimony.  As set forth above, there is conflicting record evidence as to the nature and extent of the "temporary" memorial operating on the site prior to the taking.  Moreover, and in any event, the case law to which Plaintiff cites does not hold that a direct capitalization approach is per se inapplicable in the absence of an ongoing income-producing venture.  Rather, courts have held that "[m]ere physical adaptability to a given use is not enough to invoke the capitalization method; the landowner must show that an income producing market existed at the date of the taking *or will exist in the reasonably near future.*"  United States v. 75.13 Acres of Land, 693 F.2d 813, 816 (8th Cir. 1982) (emphasis added); see also, e.g., United States v. 25.202 Acres of Land & Building Affixed to Land Located in Town of Champlain, Clinton County, N.Y., 860 F. Supp. 2d 165, 176-77 (N.D.N.Y. 2010) (same), aff'd, 2012 WL 5458026 (2d Cir. Nov. 9, 2012).  Based on the record in this case, the applicability of a direct or yield capitalization approach, including whether an income-producing private memorial and visitor's center would exist in the reasonably near future or was purely a speculative and remote potential use, are issues more appropriately addressed at trial.  Cf. United States v. 68.94 Acres of Land, 918 F.2d at 395 (trial court abused its discretion by excluding condemnee's expert valuation testimony where there was no finding that the analysis relied on events that were not reasonably probable as of the date of the taking).

The United States further argues that Bell compounded his already flawed analysis by

---

[11] The Appraisal of Real Estate lists three types of income capitalization: two "direct" capitalization techniques called the "land residual technique" and "ground rent capitalization"; and one "yield" capitalization technique referred to as "discounted cash flow analysis."  The Appraisal of Real Estate 13th ed. (Docket No. 106-8) at 142-43, 363.  Unlike direct capitalization techniques, which look at the relationship between one year's income and value, the yield approach examines the relationship between several years' stabilized income and a reversionary value at the end of a designated period.  See id.  In this case, Bell utilized direct income capitalization, applying the land residual technique.

16

choosing to apply the "land residual" technique of direct capitalization. Pl.'s Br. Supp. (Docket No. 106) at 14-16. The land residual technique is "a method of estimating land value in which the net operating income attributable to the land is isolated and capitalized to produce an indication of the land's contribution to the total property." The Appraisal of Real Estate, 13th ed. (Docket No. 106-9) at 368-69. The United States contends that the land residual technique depends significantly on variables subject to an appraiser's judgment and, therefore, allows for the manipulation of those variables, leading to an improper and unreliable valuation of the subject property. Pl.'s Br. Supp. (Docket No. 106) at 15-16. I acknowledge that the land residual technique is not the most common valuation approach and that small variations in any of the required variables can result in a dramatic change to the land value estimate. See The Appraisal of Real Estate, 13th ed. (Docket No. 106-9) at 369.[12] As even the government notes in its brief, however, the land residual technique historically has been used and is more applicable to estimate land value when sales data on similar parcels of vacant land is not available. Pl.'s Br. Supp. (Docket No. 106) at 15 (citing The Appraisal of Real Estate, 13th ed. at 363, 368). The absence of such sales data is exactly what Defendant argues in this case. Again, without commenting on the ultimate validity of Plaintiff's arguments, I find that these are issues more appropriately examined at trial.[13]

Lastly, the United States argues that, even if applicable, Bell's land residual valuation method is fatally flawed because it relies on unsupported and speculative data. Among other things, the government attacks Bell's proposed: average admission rate; bookstore and

---

[12] According to the literature, the land residual approach most commonly is used to test the feasibility of alternative uses of a particular site in the highest and best use analysis. The Appraisal of Real Estate 13th ed., at 363, 368.

[13] This conclusion applies equally to the government's argument that Bell incorrectly applied the land residual valuation method by failing to deduct income generated from structures on the property. Pl.'s Br. Supp. (Docket No. 106) at 22-25 (arguing that Bell thus improperly valued a business and not the land); see also Def.'s Br. (Docket No.113) at 9 (countering that any income generated by the memorial and visitor's center would be attributable to the unique status of the land as the Flight 93 crash site, i.e., that "the land is the value of the total property"). The United States may readdress these points through appropriate evidence, testimony, or cross examination at trial.

concession income; visitors per year; percentage of visitors paying admission; expense ratio; and capitalization rate. Pl.'s Br. (Docket No. 106) at 16-22. The United States complains that Bell's figures lack market and evidentiary support. See id. In response, Defendant submits significant documentation, including case studies and market and research data, on which Bell contends he relied. See Docket Nos. 115-117 (Def.'s Suppl. Ex. D). I disagree with the government that this data is so inapposite, speculative, and/or unreliable as to warrant pre-trial exclusion of Bell's testimony. The perceived weaknesses in Bell's supporting data are more appropriate fodder for cross-examination or counter-evidence at trial.

In short, after careful review, I disagree that Bell's valuation testimony and methodology fail the Daubert test of reliability and fit. The propriety of using the income capitalization approach, the availability of comparable sales, and other relevant issues involve questions of fact that are inappropriate for resolution at this stage of the proceedings based on the record before me. Under the facts of this case, the United States' criticisms of Bell's supporting data and the application of his methodology go to the weight, not the admissibility, of Bell's testimony. The government is free to attack Bell's testimony through testimony, evidence, and effective cross-examination at trial.

For all of these reasons, I decline to exclude Bell's valuation testimony based on his use of the land residual income approach.[14]

### III. Conclusion

For all of these reasons, the Motions in Limine are denied. I caution, however, that nothing in this ruling intimates that the appraisal methods, evidence, and/or opinions that the parties have challenged ultimately will be accepted. All that I rule here is that the parties are

---

[14] In so ruling, I am mindful of the Court of Appeals' caution against denying the landowner the opportunity to present expert valuation testimony especially where, as here, the expert's estimated fair market value differs greatly from that of the government's appraiser. See United States v. 68.94 Acres of Land, 918 F.2d at 395-96 (exclusion of condemnee's valuation expert affected a substantial right of the landowner because, had the expert testified, the jury also would have had evidence before it of property values more than twice the government's estimate).

entitled to present their evidence at trial and that I cannot rule definitively that the valuation evidence is inadmissible based on the record now before me.  See <u>United States v. 100.01 Acres in Buchanan County</u>, No. 1:00CV00185, 2002 WL 923925, at *4 (W.D. Va. May 7, 2002).  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| United States of America,                                ) | |
|            Plaintiff,                                ) | |
|            vs.                                          ) | Civil Action No.  09-233 |
| 275.81 Acres of Land, More or Less,    ) <br> Situated in Stonycreek Township,          ) <br> Somerset County, Commonwealth of   ) <br> Pennsylvania, and Svonavec, Inc.           ) | |
|            Defendant. | |

AMBROSE, Senior District Judge

### ORDER

AND NOW, this 13th day of March, 2013, it is hereby ORDERED that Defendant's Motion in Limine filed at Docket No. 104, and Plaintiff's Motions in Limine filed at Docket Nos. 103, 105, and 106 are denied.

A Status Conference is scheduled before the undersigned for April 9, 2013, at 12:30 p.m. in Courtroom 3B.  Two days prior to this conference, each party is directed to submit a position paper not to exceed five (5) pages in length setting forth its position on a trial by commission versus a trial by jury.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose
Senior Judge, U.S. District Court