# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION No. 09-233 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 275.81 ACRES OF LAND, MORE OR | ) | |
| LESS, SITUATED IN STONEYCREEK | ) | |
| TOWNSHIP, SOMERSET COUNTY, | ) | |
| COMMONWEALTH OF | ) | |
| PENNSYLVANIA, and SVONAVEC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| AMBROSE, Senior District Judge | ) | |

## REPORT OF THE COMMISSION

### A. Introduction

The within Report of the Commission constitutes the report required to be submitted by the three-member Commission appointed by the Court in the above-captioned action. The members of the Commission (James G. McLean, Esquire, Chair, Paul D. Griffith, MAI, CRE, FRICS and Mark R. Shonberg, MAI) were appointed by Orders of the Court dated April 24, 2013 and July 9, 2013. The Commission was appointed pursuant to Fed.R.Civ.P. 71.1(h). Pursuant to Federal Rule 71.1(h) and Instructions provided to the Commission by the Court, the Commission was directed to prepare and file this Report in accordance with Fed.R.Civ.P. 53(d), (e) and (f).

The Commission was appointed to determine the "just compensation" for 275.81 acres of land, more or less, located in Stoneycreek Township, Somerset County, Pennsylvania, acquired by the United States of America (the "United States" or the "Government") under its

1

constitutional power of eminent domain on September 2, 2009. The subject property includes the site of the crash of United Airlines Flight 93 on September 11, 2001. The property was owned by Svonavec, Inc. ("Landowner") on September 11, 2001 and as of the date of the taking.

The proceedings in this case were commenced by the filing of a Complaint by the United States on September 1, 2009 and the filing of a Declaration of Taking and Notice of Condemnation (Joint Ex. 1) on September 2, 2009. By the Complaint and Declaration, the United States offered to pay the sum of $611,000 as just compensation for the taking of the property. (*Id.*).

All pre-trial proceedings were conducted by the Court including all matters related to discovery, rulings regarding motions *in limine* as to the admissibility of certain evidence at trial and rulings regarding the status of certain mineral rights. A trial in the matter was conducted before the Court on October 7 through October 11, 2013. The members of the Commission were in attendance at trial and given the opportunity to question the witnesses. (Trans. 10/7, p. 38)[1]. The trial began with a view of the subject property and surrounding area in Somerset County on October 7, 2013 with the presiding Judge, the Honorable Donetta Ambrose, members of the Commission, the parties and their counsel in attendance. During the view, the members of the Commission were taken to three pre-designated locations on the subject property and the Court read a prepared script that had been reviewed in advance by the parties.

The Commission was also provided at the outset of the trial with "Instructions to the Commission" which were read into the record, and a copy of the Instructions was provided to the members of the Commission. (Trans. 10/8, pp. 2-23). The trial consisted of the presentation of several witnesses by both the Landowner and the Government and the introduction of

---

[1] References to the transcript of the trial are designated as "Trans.", the date of the testimony (e.g., "10/_") and the page of the transcript (e.g., "p. _").

documentary evidence, including appraisals of the subject property. Because the Landowner has the burden of proof to establish the compensation due (Instructions, p. 3), the Landowner proceeded first and presented the testimony of Michael Svonavec and Randall Bell, MAI, who was the Landowner's appraisal expert. The Landowner's expert concluded that the subject property was worth $23.3 million on the date of the taking. The United States presented the testimony of David Lennhoff, who reviewed and critiqued the Landowner's appraisal, Keith Newland, a National Park Service official, and Gregory Jones, MAI, its appraisal expert. The Government's expert concluded the subject property was worth $610,000.00. The Landowner presented the rebuttal testimony of Randall Bell and the United States presented the testimony of Mr. Lennhoff in rebuttal.

## B. The Subject Property

As set forth in the Instructions to the Commission, the interest taken by the United States in this matter is 275.81 acres of land in fee simple, including oil and gas rights and including eight acres of coal owned by Svonavec, Inc. located in Somerset, Pennsylvania. (Instructions, p. 6). The parties have stipulated that the value of the oil and gas interest owned by Svonavec as of the date of the taking is $105,000. (Instructions, p. 7). The subject property consists of 275.81 acres, more or less. It is located in Stoneycreek Township and is accessed by Skyline Road. The property is irregular in shape, consists of open field and groves of trees and is a former reclaimed strip-mining site that was last mined in 1998. On September 11, 2001, passengers onboard United Airlines Flight 93 overtook terrorists who had hijacked the plane resulting in the crash of the plane; the subject property includes the exact point at which Flight 93 crash-landed into the ground, killing all on board. From every indication, the actions of the passengers and crew on Flight 93 on the morning of September 11, 2001 thwarted the plans of the terrorists, making the

citizens on Flight 93 heroes and the place where they died hallowed ground. These facts are not in dispute. The Instructions stipulate that the date of taking in this case is September 2, 2009, and the Commission is to determine the just compensation to be paid based upon the property as it existed on September 2, 2009.

## C. Summary of the Testimony of the Witnesses

### 1. **MICHAEL M. SVONAVEC**

Michael M. Svonavec was the first witness called to testify on behalf of the Landowner. Mr. Svonavec was offered as a representative of the Landowner and the Svonavec family that holds the interests in Svonavec, Inc. and, through that entity, the subject property. Mr. Svonavec received a Bachelor of Science degree in mining engineering from West Virginia University in 1978 and went to work for his family's coal business, Svonavec Coal Company. (Trans. 10/7, p. 39-40). In 1981, Svonavec, Inc. was organized as a coal mining enterprise and acquired the subject property from Svonavec family members who had owned the property since 1961. (Trans. 10/7, p. 52).

Mr. Svonavec testified to his background in other business endeavors besides his family's coal business. These included Castleman Enterprises, a contracting company that engaged in mining, oil and gas and residential development activities, Tri-State Mining Supply and Mr. Svonavec's involvement with a stone quarry. (Trans. 10/7, p. 41-46). Mr. Svonavec also testified that, in the last few years, he formed a coal venture named Wilson Creek Energy that was part of an initial public offering. (Trans. 10/7, p. 46). Mr. Svonavec currently works for Argo Surety which provides services to the mining and oil and gas construction industries. (Trans. 10/7, p. 48). This testimony was offered to show Mr. Svonavec's background and experience in business ventures and in land development activities. The Court ruled that as a

representative of the Landowner, Mr. Svonavec was permitted to testify to his opinion of the value of the subject property. (Trans. 10/7, p. 52).

With respect to the property itself, Mr. Svonavec testified that it was first purchased by his family in 1961 and, prior to September 11, 2001, it had been used for farming, coal mining and leased for mining, and that buildings located on the property had been leased to others for storage of maintenance items. (Trans. 10/7, p. 53). At the time of the crash of Flight 93, the property or a portion of it was being leased to PBS Coal Company.

Mr. Svonavec described the property as it existed at the time of the crash of Flight 93 and thereafter up to the date of taking of September 2, 2009. Mr. Svonavec testified that immediately following the crash, the site was under the control of the Federal Bureau of Investigation, the Pennsylvania State Police and then the Coroner of Somerset County in furtherance of their investigations of the events relating to the crash. (Trans. 10/7, p. 61). Mr. Svonavec said that shortly after the crash occurred, hundreds (Trans. 10/7, p. 62) and then eventually thousands of people were traveling to the site in order to view the location where the crash of Flight 93 occurred. Most of these people were coming onto the property owned by Svonavec, Inc., and Mr. Svonavec testified about the problems this traffic created and the need to control the visitors' presence on the property and access to the site. (Trans. 10/7, p. 62).

In early October 2001, Svonavec, Inc. created a temporary memorial viewing area on the subject property, which was identified as "Stop No. 3" on Exhibit BBB7. (Trans. 10/7, pp. 63-64). The work done by the Landowner included some minor grading to create a parking area, paving for a viewing area and erecting a "wire" wall for placement of mementos. (Trans. 10/7,

p. 64)[2]. Mr. Svonavec testified that people continued to visit the site thereafter in the tens of thousands a month. (Trans. 10/7, p. 65).

Mr. Svonavec testified that in 2002, Congress passed Public Law 107-226 known as the "Flight 93 National Memorial Act" which established the crash site as a memorial. (Ex. BB)[3]. The Law also established the Flight 93 Advisory Commission whose duties included establishing a permanent memorial at the crash site within three years. Mr. Svonavec testified that a "Flight 93 Task Force" was also formed, of which he was a member. (Trans, 10/7, p. 68).

Mr. Svonavec testified that, after September 2002, he was contacted by the Somerset County Commissioners regarding a possible acquisition of the Landowner's property and in connection therewith, was requested to obtain an appraisal. (Trans. 10/7, p. 71). Mr. Svonavec requested Daniel McCown, a Somerset County appraiser, to prepare an appraisal but it apparently was never completed as the arrangements with Somerset County were never consummated and neither party obtained an appraisal. (Trans. 10/7, p. 72).[4]

Although there is some discrepancy in the testimony as to when, at some point, Mr. Svonavec was introduced to Randall Bell. Mr. Bell eventually prepared an appraisal of the property and testified on behalf of the Landowner at the trial. Mr. Svonavec testified that he visited the site with Mr. Bell in January 2003. (Trans. 10/7, p. 72). Thereafter, Mr. Bell presented to Mr. Svonavec his idea for the development of a "charge/no charge"

---

[2] Photographs of the temporary memorial showed that it also included a small kiosk/shed structure, some bench seating and flag poles with flags as well as nearby port-a-johns. (See, e.g., Ex. 98, Trans Associates Traffic Study, pp. A1-A5 (from 2005); Gregory Jones Appraisal Report, Ex. 7, p. 4485 (from 2008); Ex KK2, Final General Management Plan, pp. II-5 (2001), II-8 (2004), III-1 (2004), III-4 (2003)).

[3] Pub. Law 107-226, among other things, provided that the purposes of the Act were "to establish a national memorial to honor the passengers and crew of United Airlines Flight 93 of September 11, 2001" and "to establish the Flight 93 Advisory Commission to assist with consideration and formulation of plans for a permanent memorial." (Ex. BB).

[4] Daniel McCown was not called as a witness by either party, and the Commission was not provided with information regarding any of the work that he did.

memorial/visitor center/museum in which members of the public would be given access to view the site without charge and a visitor center/museum that charged an admission and included a book store and concessionaire with items for sale. These ideas were included in a preliminary business plan prepared by Mr. Bell that was introduced into evidence as Exhibit AA1. (Trans. 10/7, p. 75). The preliminary business plan, which was undated and labeled "Draft", included a description of a memorial and museum concept with a broad range of estimated expenses for capital improvements, income and operating costs. (Ex. AA1). Mr. Svonavec testified about a letter he sent to the National Park Service dated November 26, 2003 that outlined his then current plans for the property, which, the letter stated, included the establishment of a Flight 93 National Museum. (Ex. AA24; Trans. 10/7, p.78).

Mr. Svonavec then testified in detail to the projections and *pro forma* calculations he made for the development of a possible memorial and visitor center/museum building. This included his calculation of the capital expenditures required to improve the property with necessary structures and infrastructure. Documents showing the calculations were admitted into evidence at Exhibits AA31, AA20 and AA16. The calculations included Mr. Svonavec's assumptions about the number of visitors, projected attendance fee and, on the basis of those assumptions, projected revenues, expenses and capital expenditures for a memorial and museum.

Mr. Svonavec's calculations included his estimated costs for the construction of an 80 foot by 120 foot building for a museum/visitor center, including site preparation ($20,000), steel framing ($288,000), interior finishing ($150,000), HVAC ($20,000), interior finishings ($150,000) and contingencies ($10,000), which resulted in a total building cost estimate of $488,000. (Ex. AA20, p. 288; Trans. 10/8, p.4-8). Mr. Svonavec estimated that the cost for improvements to an access road to the subject property and for a parking lot and walking path

was $189,000 (Ex. AA20, p. 290-291; Trans. 10/8, p. 13), but he assumed that any improvements to public roads that patrons would travel to get to the property would be paid for by local and state governments. (Trans. 10/8, p. 14). He also estimated the cost of site improvements, including a septic sewer system ($47,400; Ex. AA20, p. 292) and water service for toilet flushing ($20,000: Ex. AA31, p. 4616) based on his assumption of 250,000 visitors a year. (Trans. 10/8, p. 22). Mr. Svonavec also estimated costs for the production of a documentary to be shown in the museum ($200,000; Ex. AA20, p. 289), and budgeted for flags and golf carts to facilitate access to the crash site ($25,000; Ex. AA20, p. 289). Mr. Svonavec explained his source for each of these estimates. His total estimate of capital costs was $1,295,400. (Trans. 10/8, p. 25).

Mr. Svonavec also testified to his calculation of the annual operating costs to operate a museum and visitor center, including expenses for employees (approximately $275,000 for janitorial, maintenance, security, ticket booth personnel, and bookstore and theatre employees), health insurance ($122,000), grounds keeping ($20,000), a manager ($80,000), taxes ($50,000), advertising ($100,000) and insurance ($35,000) and other miscellaneous items including snow plowing, property taxes and other labor. (Ex. AA20; Ex. AA31; Trans. 10/8, p. 30). The summary of these estimates by Mr. Svonavec are set forth on Exhibit AA31, which was admitted into evidence. His estimate of the total annual operating expenses for a museum and visitor center was $948,580. (Trans. 10/8, p. 34).

Mr. Svonavec projected income from the operation of a museum based on visitors of 200,000 – 300,000 a year, an admission fee of $7.00 (Trans. 10/8, p. 36) and receipts of $3.25 per visitor from purchases of flowers, books, vending and concessions. (Trans. 10/8, p. 37). Based on these calculations, Mr. Svonavec's estimates of the value he prepared over time ranged

from a low of $10.4 million (Ex. 77) to a high of $26.5 million (Ex. 79). He concluded that he thought a development of a combined, no-charge memorial and fee-based visitor center/museum was feasible and profitable and, in his view, would not involve significant risk. (Trans. 10/8, pp. 37-38). Mr. Svonavec testified that, in his opinion and based on his calculations, the value of the subject property as of the date of taking was approximately $25 million. (Trans. 10/8, p. 60).

Mr. Svonavec also testified to the arrangements over time with the National Park Service including a License Agreement entered into with the Park Service dated February 10, 2004. (Ex. EE). Mr. Svonavec testified that the License Agreement was terminated in the Fall of 2008. (Trans. 10/8, p. 43). He testified at the time of the termination, the National Park Service removed all improvements including the temporary memorial that Svonavec, Inc. had placed on the property and that the National Park Service's removal of that memorial was done without the approval Svonavec, Inc. (Trans, 10/7, p. 43-44).

## 2. **RANDALL BELL**

The Landowner called Randall Bell as its appraiser and expert witness on valuation. Mr. Bell testified to his educational background, experience in the performance of appraisals and his work with the Appraisal Institute as both an author and educator. (Trans. 10/8, pp. 133-143). Mr. Bell was admitted by the Court as an expert in the field of real estate appraisal and real estate damages. (Trans. 10/8, p. 144).

Mr. Bell testified that he became involved with the subject site not long after September 11, 2001. While Mr. Bell was uncertain as to the precise date, he recalled that he was contacted by Dan McCown, a real estate appraiser in Somerset County, and thereafter met with Michael Svonavec. (Trans. 10/8, pp. 145-147). He testified that he visited the site in January of either 2002 or 2003 and at the time, there was a temporary memorial site that had been placed there by

Svonavec, Inc. (Trans. 10/8, p. 146). Mr. Bell testified that he was working at that time for the Landowner as a consultant and assisting Dan McCown who was performing an appraisal of the property. He testified that Mr. McCown's appraisal was never finished, although he was able to recall the reasons. (Trans. 10/8, p. 148; Trans. 10/9, p. 57). Mr. Bell said that his recommendation to Michal Svonavec was to pursue a charge/no-charge model for the development of a memorial and visitor center/museum. (Trans. 10/8, pp. 149-150). Mr. Bell based this on his case studies of other historical and public interest sites including the Hiroshima atomic bomb site. (Id.).

Mr. Bell then reviewed the "draft" business plan he developed for Svonavec, Inc. which was introduced as Exhibit AA1 and had been discussed by Mr. Svonavec during his testimony. The document was a draft business plan forwarded to Mr. Svonavec in October 2003 outlining the considerations and possible costs for a charge/no charge memorial and museum/visitors center. (Trans. 10/8, pp. 152-153). Mr. Bell described the plan as "very preliminary" and as providing a template and starting point for further discussions on how the site could be developed (Id.)

Mr. Bell testified that thereafter Michael Svonavec asked him to become more involved with the project. As a result, in January 2007, Mr. Bell and Svonavec, Inc. entered into an Agreement which was introduced as Exhibit FFF. (Trans. 10/8, p. 157). The Agreement referenced a contribution by Mr. Bell of certain internet domain names, and Mr. Bell explained that he had registered a total of six domain names using the "Flight 93 Memorial" and "Flight 93 Museum" designations. (Trans. 10/8, p. 158)[5]. Under the Agreement, Bell would contribute the registered domain names and Svonavec, Inc. would contribute the property and the parties

---

[5] The domain names were: Flight93NationalMemorial.com; Flight93NationalMemorial.net, Flight93NationalMemorial.org, Flight93Museum.com, Flight93Museum.net and Flight93Museum.org.

agreed to share in any proceeds from the development of the property, 90% to Svonavec, Inc. and 10% to Mr. Bell. Mr. Bell testified that that Agreement terminated with the taking of the property on September 2, 2009. (Trans. 10/8, p. 159).

Mr. Bell testified that he was later separately retained by the Landowner as an appraiser to perform an appraisal of the property after the property was taken on September 2, 2009. (Trans. 10/8, p. 159). Mr. Bell said that his retention by the Landowner as an appraiser after his prior involvement in the project was, in his view, acceptable under the Uniform Standards of Professional Appraisal Practice ("USPAP"), and that he had verified it with an Appraisal Institute representative. (Trans. 10/8, p. 159-162)[6]. Mr. Bell testified that the condemnation of the property came as a "bit of a surprise" since he said that neither he nor the Landowner had been advised of the Act of Congress passed in 2007 which provided for acquisition of the property including by condemnation. (Trans, 10/10, p. 161).

Mr. Bell then reviewed his appraisal expert report which, as revised, was dated December 15, 2011 and was admitted into evidence as Exhibit C. Mr. Bell confirmed that there were earlier versions of his appraisal dated May 26, 2011 (Ex. A) and December 1, 2011 (Ex. B), (Trans. 10/8, p. 163), both of which were also admitted into evidence.

Mr. Bell testified that the appraisal he prepared was a "summary report", which is one of the types of report permitted under USPAP. (Trans. 10/8, pp. 164-165). Mr. Bell said that his file of research for his appraisal had more than 10,000 pages of information that he had gathered and reviewed. (Trans. 10/8, p. 165). Mr. Bell then reviewed the details of his report including the background information relating to the subject property, the properties in the vicinity and

---

[6] The Government questioned the termination of Mr. Bell's Agreement with the Landowner and whether Mr. Bell's subsequent role as an appraiser was ethically appropriate. (Trans. 10/9, p. 43-53). The Commission reached no conclusion on that specific matter but accepted that Mr. Bell performed an appraisal of the subject property that was admitted into evidence and reviewed it for its content independently of his prior role.

other relevant property information including the zoning acreage, topography, utilities and environmental condition. (Trans. 10/8, pp. 166-172).

Mr. Bell testified that as to the determination of the property's "highest and best use," he used the standard formula required by the standards of the Appraisal Institute and the *Appraisal of Real Estate*, 13th Edition. (Trans. 10/8, p. 173). In particular, he reviewed the criteria to determine whether the highest and best use of the property could be as a visitor center/memorial. He concluded that the subject property presented no physical impediments to the development of the property as a visitor center/museum. (Trans. 10/8, p. 173). He further concluded that there were no legal obstacles since there was no zoning which restricted the use of the property and Congress itself had adopted an Act designating the crash site as a memorial. (Trans. 10/8, p. 174). With respect to his analysis of the financial feasibility of a visitor center/museum, Mr. Bell testified that the memorial would be free, whereas a visitor center/museum could be a for-charge arrangement. In this regard, he said he was trying to identify the "intrinsic value" in the property attributable to the fact that the crash had occurred there and could not be relocated to any other location or site. (Trans. 10/8, pp. 175-177).[7]

Having determined that the highest and best use of the property was as a memorial with a visitor center or museum, Mr. Bell then reviewed the approaches to valuation set forth in his report. He eliminated the cost approach as not relevant. (Trans. 10/8, p. 178). With respect to a sales comparison approach, he said that the conventional sales comparison approach could not be used here, although he did, later in his report, use sales comparisons of other large tract sales in Pennsylvania to verify the ultimate value he obtained. (Trans. 10/8, p. 179). Mr. Bell testified

---

[7] Mr. Bell's report set forth his conclusion as to "highest and best use" in two places, as follows: 1) on page 11: "The highest and best use of the site as a memorial and related visitors center should be viewed as an ongoing enterprise due to the commercial viability of the site"; and 2) on page 27: "It has been determined that the highest and best use of the subject property is as a memorial and related visitor center." (Ex. C, p. 11; p. 27)).

that he used the "residual land value" approach to determine his valuation and that, in his view, the approach was in accordance with the standards of the Appraisal Institute. (Trans. 10/8, pp. 180-181).

Mr. Bell's development of the land residual technique was based upon the case studies he had undertaken of other memorial and museum sites. Mr. Bell testified that he analyzed 20 different sites and personally visited 16 of them. (Trans. 10/8, p. 182). A chart of these is contained on pages 36 and 37 of his report, and included among the 20 sites are the USS Arizona Memorial in Hawaii, the Hiroshima Peace Memorial in Japan, the Gettysburg National Military Park and the Johnstown Flood Museum. (Ex. C, pp. 36-37). Mr. Bell reviewed each of the case studies in his testimony on the stand. (Trans. 10/8, pp. 183-200). Mr. Bell testified that in his view the sites at Oklahoma City, the National Civil Rights Museum in Memphis, and the Sixth Floor Book Depository in Dallas were the most relevant. (Trans. 10/9, p. 133).

Mr. Bell testified that he used his case studies and other information to arrive at estimates of annual visitation that a memorial and visitor center/museum site could be expected to receive, and an estimate of the number of visitors that would pay an entrance to the visitor center or museum. He also included an estimate of the net revenue per visitor that could be expected from book store and concession sales. (Trans. 10/8, pp. 183-185). Mr. Bell testified that he estimated annual visitation at 230,000 visitors for the subject property primarily on the basis of the "Lord Report" that was admitted as Exhibit FF7. (Trans. 10/8, p. 202). The Lord Report was a study commissioned by the National Park Service to project possible visitation levels for a potential museum or visitor center at the Flight 93 crash site. The Report was prepared by Professor Bruce E. Lord and apparently was prepared in 2005 to assist the National Park Service in the development of its Final Management Plan dated June 2007 (that was admitted into evidence at

Ex. KK2). Based on an analysis of other historical visitor sites, the Lord Report concluded that visitation at the Flight 93 site would increase from the 130,000 that were attending as of 2003 to a peak of 400,000 and then a stabilized number of 230,000 once the site was developed with a permanent memorial and visitor center (Ex. FF7). Mr. Bell used in his residual land approach the 230,000 estimate for stabilized visitors that was projected by the Lord Report for a completed National Park Service museum and visitor center.

Mr. Bell then assumed, based on his case studies, that 80% of the visitors to a museum or visitor center would pay an entrance fee. (Trans. 10/8, p. 201). In particular, Mr. Bell pointed to several locations in his case studies which, he said, had entrance rates that were ascertainable and exceeded 90%. Mr. Bell acknowledged that revenue and admission rate information was not available for many of the sites he reviewed, either because the revenues and admission rates were unascertainable or were not provided by the operator of the site. (Trans. 10/8, p. 184). As set forth in the chart on pages 36-37 of Mr. Bell's appraisal report, the "Paid Admission Ratio" was provided for 5 of the 20 sites that Mr. Bell reviewed but not the 15 others.

Based on his review of the case studies, Mr. Bell used for his analysis an entrance fee of $9.00 (Trans. 10/8, p. 200) and concluded that a net amount of $4.00 per person would be received from sales of books and concessions (Trans. 10/8, p. 206). Mr. Bell felt that a $9.00 admission fee was within the range of admission rates charged at other museum sites, where the fees ranged from no admission fee to $30 – 35 and more for some privately operated locations such as the Empire State Building and Graceland. Based on these numbers, gross income from admissions was projected by Mr. Bell to be $1,656,000 (230,000 visitors times 80% times $9.00/person), and the revenue from book sales and concessions was estimated to be $736,000.00 (230,000 times 80% times $4.00 per person). (Trans. 10/8, p. 210; Ex C, p. 40).

With respect to expenses, Mr. Bell used what he described as "a standard real estate ratio of 30%" of revenue for expenses based upon his review of expenses ratios for national shopping center and office properties. (Trans, 10/8, p. 208). Based on these determinations, Mr. Bell then calculated the estimated projected net income from a museum operation. Mr. Bell reviewed the summary of these items, as contained at Page 40 of his report, which is set forth below:

| | |
|---|---|
| Gross Income – Admissions | $ 1,656,000 |
| Expenses | $ (496,800) |
| Net Operating Income – Admissions | $ 1,159,200 |
| Net Income – Bookstore, Concessions | $ 736,000 |
| Total Net Income | $ 1,895,200 |

Mr. Bell then applied a capitalization rate to his net income calculation. Mr. Bell used a capitalization rate of 7%. He testified that the 7% capitalization rate he chose was based primarily on a Korpacz Real Estate Investor's Survey from the Fourth Quarter of 2009. (Ex. X11; Trans. 10/8, p. 211-212)[8]. Mr. Bell also considered information from RealRates.com (Exs. X1, X2), the low-interest rate environment in 2009 and the lack of alternative investment opportunities in the Fall of 2009 which coincided with the date of taking (Trans. 10/9, pp. 4-11; Exs. X4-X10). Mr. Bell's conclusion was that the operation of a visitor center/memorial at the site was less risky than conventional real estate investment and on that basis testified that he had selected a capitalization rate of 7%. (Trans. 10/8, p. 220).

Mr. Bell testified that he estimated the "capital costs" for the construction of the buildings and improvements for the museum based on Marshall Swift's Cost Manual (Trans. 10/8, p. 222). He assumed construction costs of $300 per square foot for a 12,000 square foot

---

[8] The "Korpacz Real Estate Investor Survey" is a quarterly publication distributed by Price Waterhouse Coopers based on surveys and interviews of major institutional equity real estate investors. The report provides contemporaneous data for rates and trends in the real estate market including capitalization rates, discount rates and yield comparisons for various types of properties. It is intended to "provide important insight into the thinking of a significant portion of the equity real estate marketplace." (Ex. X11, p. 97).

building, and arrived at a total estimated cost for a museum/visitor center of $3.765 million. (Trans. 10/8, p. 223).

Based on his calculations, Mr. Bell valued the property at $23.3 million, or $194 per square foot, (Trans. 10/8, p. 247), which his report calculated as follows:

| | |
|---|---|
| Total Net Income | $ 1,895,200 |
| Capitalization Rate | 7.0% |
| Indicated Value | $27,074,286 |
| Memorial Construction Costs | $ 3,765,900 |
| Indicated Land Value | $23,308,386 |
| Rounded | $23,300,000 |

Mr. Bell testified that this was the same methodology he had used in an appraisal he had done of the World Trade Center site after the events there on September 11, 2001. (Trans. 10/8, p. 225).[9]  Mr. Bell said he then compared his per square foot value to sales of other large tracts of real estate within Pennsylvania to confirm, as a check, whether his value fell within a range shown by those sales, and based on his review of other large sales in Pennsylvania, he concluded that the value did fall within that range. Mr. Bell testified that he performed this sales comparison analysis, not to arrive at his value, but a check to see whether the resulting square footage value his valuation had produced was consistent with other sales of large tracts of land. (Trans., 10/8, p. 224-225).

### 3.  DAVID LENNHOFF

The Government's first witness was David Lennhoff, a real estate appraiser and consultant. Mr. Lennhoff testified to his review of the Randall Bell appraisal that had been submitted on behalf of the Landowner. Following a review of his background and *voir dire* by

---

[9] Mr. Bell's appraisal of property related to the World Trade Center site was not admitted into evidence and was not made available for the Commission to review.

counsel for the Landowner, Mr. Lennhoff was admitted as a real estate appraisal expert. (Trans. 10/9, p. 144).

Mr. Lennhoff testified that he did not perform his own appraisal of the subject property. (Trans, 10/9, p. 147). Rather, he submitted an Appraisal Review Report of Mr. Bell's appraisal and a subsequent report limited to a critique of the capitalization rate used in Mr. Bell's report. The Appraisal Review Report was admitted as Exhibit 5 and the critique of capitalization rate was admitted as Exhibit 6. (Trans. 10/9, pp. 147-148). Mr. Lennhoff's reports and testimony identified what he saw as a number of errors in Mr. Bell's appraisal report.

Mr. Lennhoff testified that Mr. Bell's appraisal was flawed because it asked "the wrong question" by analyzing the business enterprise value rather than the allocable land value of the subject property. (Trans. 10/9, p. 158). Mr. Lennhoff further criticized Mr. Bell's report for making the assumption or hypothetical condition that financing was readily available in September 2009, the time of the taking. (Trans, 10/9, p. 159). Mr. Lennhoff also faulted Mr. Bell's appraisal for having not viewed the need to obtain permits for any museum or other improvement as a potential risk for a buyer. (Trans. 10/9, p. 161). Mr. Lennhoff also expressed his view that the nature of the museum improvement was too insufficiently defined in Mr. Bell's appraisal to support the assumption that it could be built for $300 per sq. ft. (Trans. 10/9, p. 162).

Mr. Lennhoff's largest criticism of Mr. Bell's appraisal was the absence from it of any marketability study with regard to the proposed museum and an analysis, through a marketability study, of the likely visitors, admission rates and revenue sources. (Trans, 10/9, p. 162-164). Mr. Lennhoff defined a marketability study as a property-specific analysis to determine supply and demand and an estimate of how much visitor capture the proposed museum would be expected to

enjoy. (Trans. 10/9, p. 164). Mr. Lennhoff also faulted Mr. Bell's appraisal for assuming 230,000 visitors per year to the museum based upon the Lord Report since that study was predicated on a developed National Park Service memorial and did not, in his view, support the same conclusion for a private memorial/museum. (Trans. 10/9, p. 166).

Mr. Lennhoff also critiqued and criticized the comparable sales reviewed in Mr. Bell's appraisal on the basis that the properties were too different from the subject property to constitute suitable comparable transactions, pointing in part to the fact that, in Mr. Lennhoff's view, the subject property has no zoning, no water and sewer, no access and no other entitlements. (Trans. 10/9, p. 168). Mr. Lennhoff faulted the land residual technique adopted by Mr. Bell because, in Mr. Lennhoff's view, in order to properly apply the land residual technique, you needed to establish both a land cap rate and a building cap rate, which Mr. Bell's appraisal did not do. (Trans. 10/9, p. 174).

Mr. Lennhoff also testified that he saw no support in Mr. Bell's appraisal for the 7% capitalization rate used by Mr. Bell. Mr. Lennhoff finally disagreed with Mr. Bell's conclusions about the risk involved in the museum project. In his view, this project was more risky than conventional real estate. (Trans. 10/9, p. 181). His report identified four risk factors related to the property:

1. The property is not zoned;
2. The state of access to the site could cause delay and require expenditures of money;
3. The environmental contamination present on the property;
4. The absence of water and sewer utilities to the site.

All of these, he concluded, amounted to risk that would not justify use of the capitalization rate of 7% used in Mr. Bell's report. (Trans. 10/9, p. 183-184).

## 4. KEITH NEWLAND

The Government next offered the testimony of Keith Newland. Mr. Newland is currently employed by the National Park Service of Western Pennsylvania (Trans. 10/10, p. 2) and has been employed by the National Park Service for 32 years (Trans. 10/10, p. 3). Mr. Newland is responsible for the operation of five national park sites in Western Pennsylvania and his job duties include maintenance, administration, interpretation, law enforcement and resource management. (*Id.*)

Mr. Newland testified that he was aware of two environmental contamination issues with the subject property as of the date of taking. (Trans. 10/10, p. 5). The first was nine waste piles that were located on the subject property. The second was an area of environmental contamination encroachment onto the subject property. (Trans. 10/10, p. 5). Mr. Newland testified that both environmental issues were present on the property on September 2, 2009. (Trans. 10/10, p. 6).

Mr. Newland testified that ponds on the subject property would not be available for fire protection use, as the Landowner has assumed, because the ponds were located in the wetlands and water cannot be removed from wetland areas by regulation. (Trans. 10/10, p. 8).

Mr. Newland testified to the area where United Flight 93 crashed including the area where it impacted on the subject property. He explained that there was a "burn out area" which covered a portion of the subject property as well as other nearby properties and a debris area that covered approximately 65 to 70 acres. (Trans. 10/10, pp. 10-14). He testified that the stone in place to mark the point of impact of Flight 93 was located on the subject property, about 50 feet from the property line with other properties. (Trans. 10/10, p. 14). With respect to artifacts available to the National Park Service, Mr. Newland testified that they are "very artifact poor." (Trans. 10/10, p. 17).

Mr. Newland then described the roads surrounding the subject property and availability of access. He testified that a road coming off of Skyline Road onto the adjacent Kordell property was not a public road and the Landowner did not have any access rights over that road. (Trans. 10/10, p. 20). Mr. Newland testified that the Lord Report that Mr. Bell referenced was prepared to provide estimates of visitation to the site once a museum was built by the National Park Service and the study was are prepared based on other sites operated by the National Park Service. (Trans. 10/10, pp. 27-28).

Mr. Newland discussed issues with access to the subject property noting that the site had poor connectivity to the national highway system and tour buses visiting the site could be affected by weight limits on surrounding roads. (Trans. 10/10, pp. 29-30). Mr. Newland testified that a traffic study performed for the National Park Service (Ex. 98) concluded that the infrastructure on the roads to the subject site was inadequate to handle the volume of traffic to the temporary memorial that had been placed on the site. (Trans. 10/10, p. 31).

With respect to availability of water to the subject property, Mr. Newland testified that there were no existing water wells on the subject property as of the date of taking and that a geologist for the National Park Service had concluded that seams were not available for public water. (Trans, 10/10, p. 38). The National Park Service did dig a nearby well to provide potable water for the Flight 93 national memorial at a cost of $230,000. (Trans. 10/10, p. 39). Mr. Newland confirmed in his testimony that prior to the date of taking, the range of visitors to the subject property was between 130,000 and 167,000 per year. (Trans. 10/10, p. 53).

## 5. GREGORY JONES

The next witness for the Government was Gregory Jones, a real estate appraiser who performed an appraisal of the subject property for the United States. After testifying to his

background, Mr. Jones was admitted by the Court as an expert in real estate valuation. (Trans. 10/10, p. 65).

Mr. Jones explained that the standard of value he was asked to use in the valuation of the subject property was the definition of market value continued in the Appraisal Standards for Federal Land Acquisitions, which is also known as the "Yellow Book." (Trans. 10/10, p. 66). Mr. Jones' Appraisal of the subject property and a Supplemental Report were admitted into evidence as Exhibits 7 and 8, respectively. (Trans. 10/10, pp. 66-67)[10]. Mr. Jones was asked to describe the key elements he relied on in the definition of fair market value. He said he focused on two aspects of the definition, the word "probability" which he testified means "what is likely to happen," and the word "economic" which indicates that a buyer and seller would give due consideration to all available economic uses of the property and that if a use is not economic, then it would not be considered within the definition of market value. (Trans. 10/10, p. 68).

Mr. Jones testified that he visited the subject property in November 2008, May 2009 and again on August 3, 2010. (Trans. 10/10, p. 71). Mr. Jones said his investigation showed there is no zoning applicable to the subject property but that any development has to comply with design standards imposed by Somerset County. (Trans. 10/10, pp. 72-73). Mr. Jones described the area surrounding the subject properties. He identified that, as of the date of the taking, the subject property had electricity and telephone but no public water or public sewer. (Trans. 10/10, p. 74). Mr. Jones discussed the environmental contamination of the property and stated that his information came from an environmental assessment performed by Marks Environmental, which

---

[10] Mr. Jones conceded in his testimony that his Supplemental Report corrected a math error that was contained in his initial report. (Trans. 10/10, p. 187). He also acknowledged that his original report did not disclose the prior review appraisal he had done of an appraisal of the subject property by Thomas Kabat, MAI, CRE and Philip Cook, MAI of LECG, (Trans. 10/10, p. 157), which the Landowner contended was a violation of USPAP ethical standards. The Commission reached no conclusion on that specific matter but accepted that Mr. Jones performed an appraisal of the subject property which was admitted into evidence and reviewed it for its content independently of whether he was required to disclose a prior role.

had identified a 3.3 area of the subject property that had "arsenic and other metals in that area." (Trans. 10/10, p. 75). The contamination, Mr. Jones testified, had originated on adjacent property not owned by the Landowner. Mr. Jones said that, in his view, the presence of contamination would be a "red flag" for a buyer due to associated liability issues that could adversely affect the property's value. (Trans. 10/10, p. 77). Mr. Jones testified that a March 2010 Marks Environmental report estimated the cost to remediate the contamination at $935,000 for residential use and $217,000 for non-residential use. (Trans. 10/10, pp. 77-78). Mr. Jones testified that, most likely, the party that was responsible for the contamination would be responsible for the cleanup. (Trans. 10/10, p. 78).

Mr. Jones reviewed the other investigations he made regarding the subject property including photographs of the subject property and surrounding area as well as his discussions with a local real estate broker, the Chief of Planning for Somerset County, the Sewer Inspector for Stoneycreek Township and the Executive Director of the Somerset County Economic Development Council. (Trans. 10/10, pp. 79-82). Mr. Jones testified that based upon his review of the Marks Environmental report, as well as a report by the EADS Group, he concluded that it was difficult to add a good septic system on reclaimed strip-mined property like the subject property. (Trans. 10/10, p. 83).

Mr. Jones testified that he was told by local authorities there had not been any new development in the surrounding area as a result of the Flight 93 crash. The reason he said was that although 150,000 visitors were coming per year, the traffic was "just too seasonal" and not significant enough to warrant investment in something such as a hotel. (Trans. 10/10, p. 84).

Mr. Jones testified that based upon his review of the report from the EADS Group, the condition of sub-surface soils on the property were such that it would be necessary to drill 600-

foot wells to get below the coal field to provide water to the site. (Trans. 10/10, p. 87). The EADS report estimated $940,000 for a water system. The estimate for a private sewer system was $820,000. (Trans. 10/10, pp. 87-88). Mr. Jones testified that the consequence of the contamination on the property was the risk it presented to the buyer who might not be able to recover the purchase price if the buyer had to resell the property. (Trans. 10/10, p. 89).

Mr. Jones reviewed a traffic study authored by Trans Associates which, he said, concluded that the road system adjacent to the subject property, particularly Lambertville Road and Skyline Road, were insignificant to support the kind of traffic, including heavy bus traffic, that could be expected for a Flight 93 Memorial operated by the National Park Service. (Trans. 10/10, p. 89). Mr. Jones also reviewed the Lord Report regarding visitation and stated that that study had estimated that in connection with a proposed National Park Service memorial, visitors could reach a maximum of 400,000 but would stabilize at 230,000 on a long-term basis. (Trans. 10/10, p. 91).

Mr. Jones then reviewed his analysis of the "highest and best use" of the subject property including the standards applicable to that determination. He testified that he initially set aside the effect on value, if any, of the crash itself and the presence of the point of impact on the site. (Trans. 10/10, p. 95). Mr. Jones explained that he considered the physical characteristics of the property and, as to the contamination, he testified that it would affect his determination of highest and best use "to some extent," but stated that the 3.3 acres of contamination is really "a small percentage of the 276 acres." (Trans. 10/10, p. 96). He further explained that the lack of water and sewer impacted his determination of highest and best use as it would require a consideration of the cost necessary to provide those utilities. (Trans. 10/10, pp. 96-97). He also considered the state of access to the property and the need for improvements to the roadways, but

he did not investigate whether the State or Township would be responsible for the improvements to the roads. (Trans. 10/10, p. 97).

Mr. Jones testified that he eliminated a number of uses in his highest and best use including most commercial, industrial and high density residential uses. He also concluded that a small lot residential development was not feasible because of difficulty in obtaining percolation for septic systems. (Trans. 10/10, pp. 98-99).

Mr. Jones then testified that, in his opinion, the fact that the crash of Flight 93 occurred on the subject property does not make it more valuable in and of itself. (Trans. 10/10, p. 100). It would require some way to monetize the event in order to make it more valuable, Mr. Jones testified. He did consider the fact that at the time of the taking, up to 150,000 to 160,000 visitors came to the site, which suggested some use that could take advantage of the visitor traffic could potentially be valuable or create value. (*Id.*). Mr. Jones did not consider the subject property a memorial on September 2, 2009 (the date of taking) because, in his opinion, a memorial has to have some kind of a structure on it, like a monument or a statue, and none was on the property as of that date. (Trans, 10/10, p. 168).

Mr. Jones explained that he then undertook a "sensitivity analysis" to determine the financial feasibility of a private museum or business related to the crash of Flight 93. He testified that his objective was to test a number of variables to see how vulnerable the museum business model was to small changes and assumptions about visitor traffic, admission prices and other factors. (Trans. 10/10, pp. 101-102). Mr. Jones testified that his sensitivity analysis was not an evaluation or an appraisal but was an analysis undertaken to test the financial feasibility of the museum use as part of his "highest and best use" analysis. (Trans. 10/10, p. 103).

In connection with the sensitivity analysis, Mr. Jones testified that he reviewed an appraisal report prepared by the firm LECG and specifically, Thomas Kabat, MAI, CRE and Philip Cook, MAI[11]. Mr. Jones had prepared a review appraisal of the report done by LECG that was not admitted into evidence. (Tran. 10/10, p. 104). Mr. Jones acknowledged that the highest and best use conclusion reached in the LECG report was a privately owned museum and visitor's center in connection with the Flight 93 incident. (Trans. 10/10, p. 105). Mr. Jones testified that he disagreed with LECG's conclusion but thought the data included in the LECG report "was good" and "fairly done." (Trans. 10/10, p. 106). Mr. Jones said he spot-checked the LECG information and conducted his own review of other museum and special interest sites.

Mr. Jones then reviewed his sensitivity analysis which is contained in Exhibit 8. Mr. Jones said his sensitivity analysis, which was in effect a *pro forma*, was divided into two parts. The top half was a *pro forma* for development costs and the bottom half was a *pro forma* of the museum business operation. In his analysis, Mr. Jones estimated the cost to construct a 7,500 square-foot museum building, a 5,000 square foot observation deck, parking lot, directional signs, landscaping and installation of a water system and sewer system. He also included $375,000 for the costs of widening Skyline Road and $1,000,000 for storm water and sewers. His estimate of the total direct cost for the improvements was $3.8 million. (Trans. 10/10, pp. 112-113; Ex. 8, p. USRPT010277).

Mr. Jones applied to this analysis a capitalization rate of 12% which he testified represents "an appropriate risk rate for a project of this nature." (Trans. 10/10, pp. 113-114). In Mr. Jones' view, this was a "relatively risky project" (*id.*) and was more risky than a fully leased

---

[11] A "Self-Contained Appraisal Report" dated February 12, 2008 prepared by Thomas E. Kabat, MAI, CRE and J. Philip Cook, MAI, CRE of the firm LECG was admitted into evidence as Ex. 102 and was referenced by both Mr. Jones and Mr. Bell in their testimony. In the testimony, the report was referred to as both the "LECG Report" and the "Cook and Kabat Report" and both references are used in this Report to be consistent with the testimony.

office building that might be sold at an 8% capitalization rate. Mr. Jones applied the 12% capitalization rate he chose to his calculation of the development costs to arrive at an annual rental amount for the property of $466,633. (Ex. 8, p. 010227).

With respect to the *pro forma* for the business portion of his analysis, Mr. Jones set forth three different scenarios based on his assumptions regarding visitor attendance ranging between 170,000 and 230,000, and admission fees ranging between $7.00 and $10.00 per person. (Trans. 10/10, pp. 116-117). Mr. Jones assumed that of those visitors attending, 60% would purchase tickets to enter the museum. In his analysis, Mr. Jones assumed the admission fee would be between $7.00 and $10.00 and that an additional $2.00-$3.50 would be received from store sales and food and beverage profit.

Mr. Jones then explained the expenses that he included in his analysis of the business model. (Trans. 10/10, pp. 125-127). The operating expenses included $10.00 a square foot for building expenses, snow removal costs of $30,000, marketing of $50,000, $425,000 for management and employee costs and $50,000 for legal and accounting. (Ex. 8, p. 010227). Mr. Jones testified that the scenarios in his analysis showed some scenarios in which the business was profitable and others in which it was shown to be unprofitable. Mr. Jones also considered the possibility of competition for a museum or visitors center from other adjoining properties, which he theorized could cause an "equilibrium in pricing". (Trans. 10/10, p. 129). He felt that the dramatic shifts from positive to negative based upon a few changes in the assumptions meant that there were too many variables and there was not a sufficient degree of assurance that the project could be financially feasible. On that basis, Mr. Jones testified that since he was not clearly convinced that the project is financially feasible, he could not use the museum development model as the highest and best use. (Trans. 10/10, p. 128).

Mr. Jones' conclusion was that the highest and best use of the subject property was for open space. (Trans. 10/10, p.131). He then explained the sales comparison approach that he took in order to arrive at a value for the subject property based on a highest and best use of the property as open land. (Trans. 10/10, p. 131). Mr. Jones explained that he did not use the cost approach or income approach due to the circumstances related to the subject property. (Trans. 10/10, pp. 131-132). Mr. Jones then went through each of the comparable sales he reviewed which consisted of sales of other large tract property in the Somerset County area and the adjustments that he made to those comparable sales in arriving at his value for the subject property. Based on his analysis, Mr. Jones concluded that the value of the subject property as of the date of taking is $610,000 (Trans. 10/10, pp. 155-156), which equals approximately $2,218.00 per acre.

### 6. REBUTTAL TESTIMONY

Both parties offered rebuttal testimony that focused on the Landowner's appraisal report from Mr. Bell. Mr. Bell retook the stand and defended his report in response to the review and criticisms made by Mr. Lennhoff. In the course of his rebuttal testimony, Mr. Bell undertook to "synthesize" the components of his valuation with those of Gregory Jones and the LECG Report that was referred to and admitted into evidence. As to the information in the LECG Report, Mr. Bell said that the numbers in the report were acceptable, but he disagreed with the discounted cash flow analysis it employed as not the proper approach. (Trans. 10/11, p. 4). The comparison of the three appraisals was included on a chart Mr. Bell created in the courtroom and that was admitted as Exhibit KKK. The comparison of the three valuations showed that the reports used assumed visitation numbers ranging from 150,000 to 230,000 visitors per year. The assumed percentage of visitors who pay an admission fee in the three reports varied from 60% to 80%,

with Mr. Bell's being the highest at 80%. Mr. Bell testified that the entrance fees in the reports also varied from a low of $5.00 in the LECG report for a temporary memorial to a high of $9.00, which again was Mr. Bell's number. Mr. Bell's chart showed that, although the elements included were not identical, the total construction cost that he and Mr. Jones used were $3,765,000 and $3,800,000 (as adjusted for some items), which Mr. Bell said showed consistency[12]. The comparison of the cap rates in the several appraisals showed that they were varied widely and were, he said, between 5.5% and 12%. (Trans, 10/11, p. 5-11)[13].

Mr. Bell also defended his McDonald's franchise explanation. He compared two hypothetical properties, one with a McDonalds and another with a lesser known hamburger operation, and theorized that the property with the McDonalds operation would be more valuable. The McDonalds operation, however, could be relocated to another property, which would diminish its value but in that regard it was unlike the subject property that was the immovable, singular location of the Flight 93 crash and therefore in Mr. Bell's value crated intrinsic value. (Trans. 10/8, p. 176; 10/9, 100-101).

In the course of is rebuttal testimony, to refute Mr. Lennhoff's criticism that his land residual approach did not isolate the value attributable to the land from the value of the business, Mr. Bell also offered his "kiosk" explanation. While stating upfront that the "kiosk" model was a mechanism for explanation and an arrangement that would never actually be done because it

---

[12] The LECG report employed a yield capitalization or discounted cash flow model that determined land value based on a return to the landowner by projecting net operating income, assuming a sale of the property at the end of an assumed holding period (the reversionary interest) and then discounting the net income and the reversionary interest to present value by a market yield rate. (Ex. 102, p. 40). Because that approach is calculated on projected income only and is not dependent on costs of improvements, the LECG report did not include a construction cost estimate.

[13] A direct comparison of the capitalization rates used in the three reports is complicated by the fact that each report applied a capitalization rate for a different purpose: Mr. Bell's was to capitalize net income in his land residual approach to valuation, LECG's was to value the reversionary interest at the end of the assumed holding period as part of its yield capitalization approach, and Mr. Jones' was to capitalize the development cost of a pro forma museum to determine an assumed rent as part of his sensitivity analysis to see if a museum was financially feasible for his highest and best use analysis.

would be inappropriate, (Trans. 10/10, p. 233), Mr. Bell said that if a wall were placed around the boundary of the subject property and the only way to enter to see the crash site was through a kiosk where admission was charged, it would show that the presence of the crash site on the subject property had a value that was attributable to the real estate or the land itself, (Trans. 10/10, p. 234), and stripped out the notion of any business value. (Trans. 10/10, p. 233). In response to questioning, Mr. Bell said that in his view the "charge" for the kiosk admission would be $5.00, an estimate he was comfortable with and which he said was supported by the analysis in the LECG report. (Trans. 10/11, p. 26-27).

The Government called Mr. Lennhoff on rebuttal, to respond to the matters addressed by Mr. Bell in his rebuttal testimony. Mr. Lennhoff reiterated his view that real estate value has to be separated from business value and criticized Mr. Bell's example of the value created by a McDonald's franchise. (Trans. 10/11, p. 31-32). With respect to Mr. Bell's "kiosk" example, Mr. Lennhoff said the question for the appraiser is to ascertain the economic impact of the fact that the plane crashed on the subject property (Trans. 10/11, p. 33) and he referenced an example where a criminal event that had occurred on a property had decreased its value. (Id.). Mr. Lennhoff also discussed his assessment of Mr. Bell's determination of the capitalization rate and explained his conclusion that a 7% cap rate was not supported. (Trans. 10/11, p. 38).

### D. Instructions to the Commission

The Commission was provided Instructions, both verbally and in writing, at the outset of the trial. The Instructions state that the Report of the Commissioners is to be written "so that the path followed by the Commissioners in reaching the amount of the award can be distinctly marked". (Instructions, p. 14). We have been instructed that we are to make specific findings as to the matters on which our valuation is based, show how we applied the principles of law in

reaching our ultimate conclusion and state our reasons for arriving at particular valuations. (Instructions, p. 14).

The Instructions also tell us that the Landowner has the burden to establish just compensation by a preponderance of the evidence. (Instructions, p. 3). The Commission is to consider the evidence in regard to its "weight and credibility" and credit the evidence that appears to be "more reasonable and otherwise trustworthy". (Instructions, pp. 3-4). We are "to consider only the evidence in the case" but we are not limited to the bald statements of the witnesses and are "permitted to draw from the facts [we] find to have been proved such inferences as seem justified in light of [our] experience." (Instructions, p. 5). The Instructions advise that the members of the Commission are the sole judges of the credibility and reliability of the witnesses and the weight to be given the testimony of each witness. With respect to the testimony of expert witnesses in particular, we are to weigh the witness' experience and knowledge including whether the opinion of the witness is based upon sufficient education and experience and whether any testimony, according to our own knowledge is extravagant, unreasonable or contrary to common sense. (Instructions, pp. 5-6).

As set forth in the Instructions, "just compensation" means the fair market value of the land or interest therein that is taken by the Government, to be determined as of the date of taking. (Instructions, p. 7). The Instructions provide the Commission with the definition of fair market value to be applied. "'Fair market value' means the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have been sold on the effective date of the taking, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable

buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the taking." (Instructions, p. 8).

The Instructions state that in arriving at the decision concerning fair market value, the Commission is to "take into account all factors that could fairly be suggested by the seller to increase the price paid, and all counter-arguments that the buyer could fairly make to reduce the price, but no consideration whatever should be given to matters not affecting market value." (Instructions, p. 8). The Instructions also state that the fair market value "must be determined based on the property's highest and best use." (Instructions, p. 9).

Following trial, the Commission submitted two questions to the Court for clarification and on November 25, 2013, the Court entered a Memorandum Order of Court addressing the two questions. The first question requested clarification of how the Commission should include in its determination the oil and gas interests, stipulated by the parties to have a value of $105,000 as of the date of taking and the eight acres of coal owned by the Landowner. The Court's Order states that under a concept known as the "unit rule," the "entire estate must be valued as a whole" and "it is improper to add together the individual values of the various estates or component parts of the property." The Commission is to consider the contributory value, if any, of the oil and gas interests and the coal to the fair market value of the property as a whole, and as to oil and gas interests must consider the value stipulated to by the parties.

The Commission's second question requested clarification of the extent to which the Commission may consider and rely on activity, reports and information undertaken or generated by the Government prior to the date of taking, September 2, 2009. The Court's response states that under a concept known as the "scope of the project rule," the Commission may not consider information, reports or events that occurred or were generated by the Government from the time

the Government committed itself to the project even if it predated the actual date of taking. Neither enhancement nor reduction in value attributable to the Government's project is to be considered. In the November 25, 2013 Memorandum Order, the Court finds that the "project" in this case is "the development of the public Flight 93 National memorial" and the United States committed to the project, not on the date of the taking in 2009, but in 2002, when Congress authorized a public memorial at the crash site with the enactment of the Flight 93 national Memorial Act, Pub. L. No. 107-226. Accordingly, the Commission understands that it may not rely on documents or evidence that relate to the United States' use and creation of a public memorial on the property to determine highest and best use or fair market value because to do so would violate the "scope of the project rule." The Court's Memorandum Order clarifies that the Commission may, however, consider relevant information contained in such documents that is general to the market (such as generic information about the property or market area) and that a private developer would consider in assessing the demand for and viability of a private memorial.

### E. The Commission's Determination

#### 1. Review of the Expert's Appraisals

Because of their central importance to the parties' respective positions, we begin with a summary and comparison of the reports of the two appraisal experts, Randal Bell and Gregory Jones. In the end, for the reasons explained below, we accept neither appraisal *en toto,* but it is worthwhile to look at a comparison between the analyses performed by Mr. Bell (in his valuation appraisal, Ex. C, pp. 38-40) and Mr. Jones (in his feasibility test that was part of the highest and best use analysis in his appraisal, Ex. 8, p. 004400 - 004401). Both experts used a model that projected the performance of a business enterprise, delineated out each agent of production

necessary to achieve the projected performance level of the business, and ultimately sought to arrive at just the contributory value of the land. The following chart compares Mr. Bell's valuation with the three scenarios in Mr. Jones' feasibility analysis:

*Comparative Analysis - Bell vs. Jones Scenarios*

|  | Bell | Jones 1 | Jones 2 | Jones 3 |
|---|---|---|---|---|
| Visitation | 230,000 | 170,000 | 200,000 | 230,000 |
| % Capture | 80% | 60% | 60% | 60% |
| **Patronage** | **184,000** | **102,000** | **120,000** | **138,000** |
| | | | | |
| Entry Fee | $9.00 | $7.00 | $8.00 | $10.00 |
| **Admissions** | **$1,656,000** | **$714,000** | **$960,000** | **$1,380,000** |
| | | | | |
| Sales | $4.00 | $2.00 | $2.50 | $3.50 |
| **Other Income** | **$736,000** | **$204,000** | **$300,000** | **$483,000** |
| | | | | |
| **Total Revenue** | **$2,392,000** | **$918,000** | **$1,260,000** | **$1,863,000** |
| Operating Reserve | $0 | $0 | $126,000 | $186,300 |
| **Effective Income** | **$2,392,000** | **$918,000** | **$1,134,000** | **$1,676,700** |
| | | | | |
| **Operating Costs*** | **$496,800** | **$630,000** | **$630,000** | **$630,000** |
| Ratio | 21% | 56% | 50% | 38% |
| | | | | |
| **Net Income** | **$1,895,200** | **$288,000** | **$504,000** | **$1,046,700** |
| Capitalization Rate | 7.00% | 12.00% | 12.00% | 12.00% |
| | | | | |
| **Dev. Cost w/o Land** | **$3,765,900** | **$3,888,610** | **$3,888,610** | **$3,888,610** |
| | | | | |
| **Profit** | **$0** | **$507,210** | **$507,210** | **$507,210** |

*For comparative purposes, the information for the Jones scenarios is taken from Table A-2 (Property Owner Development Proforma) in Mr. Jones' Supplemental Report introduced as Ex. 8 and the rent expense is removed.

This summary is not intended to speak to the plausibility of either model, but instead serves only to identify the primary factors influencing the variations in the conclusions each expert reached.

The following discussion exams the data that each expert used to arrive at their estimates for each component, as well as the support they cited for their specific selection.

**Visitation**
*Comparative Variables - Bell vs. Jones Scenarios*

| | Bell | Jones 1 | Jones 2 | Jones 3 |
|---|---|---|---|---|
| Visitation | 230,000 | 170,000 | 200,000 | 230,000 |

Both experts began their analysis with projected visitation attendance for an assumed fully-developed museum. Mr. Bell testified (Trans. 10/8, p. 201-205) that for visitation numbers, he considered market data (based on the 20 sites in his case studies), visitation to the subject property as of the date of condemnation, and primarily the Lord Report (Ex. FF7). He also considered numbers from actual counts done by the National Park Service at the subject property. (Ex. FF6). (Trans. 10/9, p. 203-04). Mr. Bell then accepts and uses in his valuation the Lord Report figure of 230,000 visitors for a National Park Service museum on a stabilized basis. (Trans. 10/9, p. 203-12).

Mr. Jones testified that he spoke Mr. Silka, Executive Director of the Somerset County Economic Development Council who indicated an annual visitation of about 150,000 to the site as of the date of taking. (Trans. 10/10. p. 83-84). Mr. Jones also testified that he reviewed the Lord Report (Trans. 10/10. p. 86), and that the figures in the Lord Report were predicated on the construction and operation of a National Park Service facility (Trans. 10/10. p. 91). Other testimony from Mr. Jones indicated his reliance on profiles developed in the LECG appraisal and a 2009 study authored by Brenda Reigle, Director of the Pennsylvania Bureau of Historic Sites and Museums. (Trans. 10/10. p. 118). The Lord Report confirms that actual visitation to the subject property in the period prior to condemnation was in the range of 117,000 to 167,000 persons per year. (Ex. FF7).

**Capture Rate**
*Comparative Variables - Bell vs. Jones Scenarios*

| | Bell | Jones 1 | Jones 2 | Jones 3 |
|---|---|---|---|---|
| Capture Rate | 80% | 60% | 60% | 60% |

Both experts included an assumption about the percentage of visitors that would pay an admission fee to enter and visit a fully-developed museum. Mr. Bell does not offer direct support for the capture rate estimate he uses in his valuation, other than to note the overall range exhibited in some of the 20 comparative sites he references. He noted that some of the locations in his studies were are more cooperative than others in providing information and information about percentage of visitors paying admission to a museum or visitor center was not available for all of the sites. (Trans. 10/10, p. 184). Mr. Jones testified that he considered information in the LECG study on attendance ratio, had a conversation with Brenda Reigle about attendance ratios at their facilities, and reviewed statistics in her 2009 study of Pennsylvania historic sites and museums. (Trans. 10/10, p. 118). He also looked at the Johnstown Flood Museum, which he reports as having a capture rate of less than 40% (although without the benefit of comment from him regarding distance between site and museum, which are in fact miles apart). He argues that as to the subject property, the focus of visitation would be external to the structure, which he says supports a lower capture rate. (Trans. 10/10, p. 119).

**Entry Fee**
*Comparative Variables - Bell vs. Jones Scenarios*

|           | Bell   | Jones 1 | Jones 2 | Jones 3 |
|-----------|--------|---------|---------|---------|
| Entry Fee | $9.00  | $7.00   | $8.00   | $10.00  |

For the admission rate, Mr. Bell relied heavily on the 20 historic sites he listed in the cases studies included in his appraisal, and particularly Gettysburg and the Johnstown Flood Museum. (Trans. 10/8, p. 200). He also testified to the difficulty in segmenting revenues at the other locations between admissions and donations. (Trans. 10/8, p. 184). Mr. Jones testified that he relied on the LECG study and the PA Historic Sites study. (Trans. 10/10, p. 120).

## Sales (Concessions/Souvenirs)
*Comparative Variables - Bell vs. Jones Scenarios*

|         | Bell   | Jones 1 | Jones 2 | Jones 3 |
|---------|--------|---------|---------|---------|
| Sales   | $4.00  | $2.00   | $2.50   | $3.50   |

Mr. Bell testified that his assumption of $4.00 for books and concession sales was based on the comparative properties in his case studies, and represents a net figure (net of the cost of the goods sold). (Trans. 10/9, p.132). He also factored in a lack of alternatives within immediate proximity due to the remoteness of the subject property. Mr. Jones testified that he relied on the LECG report. (Trans. 10/10, p. 120).

## Operating Reserve
*Comparative Variables – Bell vs. Jones Scenarios*

|                   | Bell | Jones 1 | Jones 2  | Jones 3  |
|-------------------|------|---------|----------|----------|
| Operating Reserve | $0   | $0      | $126,000 | $186,300 |

Mr. Bell makes no allowance for an operating reserve. Mr. Jones testified that this is a contingency allowance for operations and refreshment of exhibits. (Trans. 10/10, p. 120). There is no support for this estimate in Mr. Jones' report.

## Operating Costs
*Comparative Variables – Bell vs. Jones Scenarios*

|                 | Bell     | Jones 1  | Jones 2  | Jones 3  |
|-----------------|----------|----------|----------|----------|
| Operating Costs | $496,800 | $630,000 | $630,000 | $630,000 |

Mr. Bell testified that expense ratios from the comparative sites in his case studies ranged from 23% to 100% of the income, although again the extent of income from paid admission and donations was not always clear. (Trans. 10/8, p. 207). Mr. Bell used 30% based on the standard marketplace expense ratio for retail and office properties. He further testified that the 30% ratio he used was for real estate only. (Trans. 10/8, p. 208). Mr. Jones operating costs were based on Mr. Jones review of financial reports from museums available from the Internet and other sources. (Ex. 8, p. USRPT010276). Mr. Jones testified

that based on his review of information from selected other sites, if grants, gifts, and donations are excluded from the revenue in the other historic and museum locations, every other comparable museum operation he reviewed lost money. (Trans. 10/10, p. 07).

**Capitalization Rate**
*Comparative Variables - Bell vs. Jones Scenarios*

|                      | Bell | Jones 1 | Jones 2 | Jones 3 |
|----------------------|------|---------|---------|---------|
| Capitalization Rate  | 7%   | 12%     | 12%     | 12%     |

Mr. Bell testified that he relied on the Korpacz Survey (4th Quarter, 2009) for the capitalization rate he used, and used the quarter following the date of condemnation (i.e., used the 4th quarter of 2009 for the September 2 date of taking). (Trans. 10/8, p. 211). He further testified that he also relied on RealtyRates.com, (Trans. 10/8, p. 213; Ex. X) and considered Costar data. (Trans. 10/8, p. 215; Ex. X3). He further testified that this data corroborated his estimate, based on his view that his museum model for the subject property carried less risk than a shopping center or office building. (Trans. 10/8, p. 217) Mr. Bell then discussed the variation between land and building cap rates and essentially equated his estimate to a land cap rate. (Trans. 10/8, p. 218). Mr. Bell also looked at the LECG report. Mr. Jones testified that an office building might sell at an 8% cap and that the Korpacz Survey (which he also consulted) references land development at a 20% yield rate; the 12% he selected rate is, he said, within this range. (Trans. 10/10, p. 114)

**Development Cost**
*Comparative Variables - Bell vs. Jones Scenarios*

|                   | Bell         | Jones 1      | Jones 2      | Jones 3      |
|-------------------|--------------|--------------|--------------|--------------|
| Development Cost  | $3,765,900   | $3,888,610   | $3,888,610   | $3,888,610   |

Mr. Bell testified that his development costs were taken from Marshall & Swift, an industry publication of construction costs, and he based his costs on the construction costs for museums in Marshall & Swift of $300 a square foot. (Trans. 10/8, p. 223). In later testimony,

however, Mr. Bell said that other non-real estate components of the museum development such as artifacts, content and film were included in the development cost estimate he made. (Trans. 10/9, p. 112). This reduced the credibility of the support for the development cost estimate because the construction cost estimates provided in Marshall & Swift do not include those items. Mr. Jones used the Johnstown Flood Museum as a basis for the size of the facility he assumes in his calculation. (Trans. 10/10, p. 111). The building and site development costs used by Mr. Jones are taken from Marshall & Swift. (Trans. 10/10, p. 112). The storm water management costs used by Mr. Jones of $1,000,000 is unsupported, but is identified as less than what was estimated in the EADS report. Mr. Jones uses engineering costs of 6%, which he reported as an industry standard and his estimate includes a "developer's profit and overhead" of 15%. (Ex. 8).

**Profit**
*Comparative Variables - Bell vs. Jones Scenarios*

|  | Bell | Jones 1 | Jones 2 | Jones 3 |
|---|---|---|---|---|
| Profit | $0 | $1,109,850 | $1,109,850 | $1,109,850 |

Mr. Bell makes no allowance for profit and states that his methodology is guided by The Appraisal of Real Estate and references the "extraction" method. (Trans. 10/8, p. 181). Mr. Jones makes an allowance for profit; however, it is not specifically identified in his report.

The foregoing summary provides an overview of the approaches taken by the two experts and the sources each consulted and relied in providing their analysis. It also provides a review of the evidence that was admitted at trial and that is therefore available to the Commission in reaching its determination.

## 2. **Highest and Best Use**

### a. The Instructions on "Highest and Best Use"

The Instructions require the Commission to make a finding as to the highest and best use of the subject property and direct the Commission to include in its Report the reasons for its finding as to the highest and best use. (Instructions, p. 14). "Highest and best use" is to be determined on the basis of four criteria: what uses are (1) physically possible; (2) legally permissible; (3) of the alternative uses that are both physically possible and legally permissible, which are financially feasible; and (4) of those, which use is maximally productive. (Instructions, p. 9). The parties were in agreement that this is the standard to apply. (See, Ex. C (Bell); Ex. 7 (Jones)). The Instructions state that "[a]s the foundation for a thorough investigation of the competitive position of the property in the minds of market participants, it is essential that a careful highest and best use analysis precede the application of the approaches to value." (Instructions, p. 9).

### b. The Parties' Positions on Highest and Best Use

At trial, the parties offered different conclusions regarding the "highest and best use" of the subject property. The United States, through its expert witness, Mr. Jones, presented its conclusion that the highest and best use of the subject property was "land used for crops, pasture, hunting and recreation, farmettes and large-tract home sites." (Ex. 7, p. 29). The Landowner, through its appraisal expert, Mr. Bell, offered its conclusion that the highest and best use of the subject property "is as a memorial and related visitors center." (Ex. C, p. 27). Considerable attention was devoted at trial to the parties' determinations of "highest and best use." The Government's expert, Mr. Jones, while acknowledging that a private Flight 93 museum may be among the property's *possible* higher and better uses (Ex. 7, p. 29), ultimately concluded on the basis of the "sensitivity analysis" included in his appraisal report that the private museum

concept was too economically speculative to support a conclusion that it is the property's highest and best use. Mr. Jones concluded that the high degree of variability in the economic analysis of a private museum precluded him from finding that such a use was financially feasible. The Landowner's expert, Mr. Bell, concluded based upon his valuation that a private museum was financially feasible and testified that, in his view, it was a low-risk venture.

In addition to the disparate conclusions they reached on whether a museum and visitors center was financially feasible, the Government and Landowner disagreed on what use was being made of the subject property as of September 2, 2009, the date of taking. This is important to note because the Instructions provide that "[t]ypically, the use to which the property is subjected at the time of the taking is its highest and best use" (Instructions, p. 9) and under standard appraisal methodology, the use of the property at the time of valuation is presumed to be its highest and best use. (See Trans. 10/10, p. 173 (G. Jones)). The Landowner's view was that as of September 2009, the site was being used as a memorial. The factors the Landowner pointed to were that a temporary memorial had been in place on the site for several years, between 117,000 and 167,000 visitors had come to the site each year since the date of the crash and Congress had enacted legislation in 2002 that designated the area where Flight 93 crashed as a memorial site. The Government's expert concluded that while six acres of the subject property out a total of 275.81 acres had been set aside and designated as sacred ground, for the property to constitute a memorial required, in his view, the placement of a statue or other monument (Trans. 10/10, p. 168). Because nothing formal like a statue of monument was present at the subject property on the day of taking, Mr. Jones concluded that the use of the subject property as of the date of taking was as open field, pasture and reclaimed mining property, not a memorial.

c.    The Use of the Property on the Date of Taking

Based on the evidence presented, the Commission considered three uses in its highest and best use analysis: (1) pasture, agricultural and recreational use; (2) a private memorial; and (3) a museum and visitors center.[14]   Before analyzing each of these uses under the four-part criteria for determining highest and best use, the Commission first considered the use of the subject property as of the date of the taking and concluded that it was as a memorial.  This finding is based on the following combination of facts.  First, from the date of the crash on September 11, 2001 through the date of the taking eight years later, it is undisputed that between 117,000 and 167,000 people visited the subject property each year to pay their respects.[15]  Second, from shortly after the crash (October 2001) until the fall of 2008, when it was removed by the National Park Service but while the property was owned by the Landowner, there was a temporary memorial on the subject property.  A further overarching reason for the Commission's finding is that, given the heroic and historically significant events that led to it, once the crash of Flight 93 occurred on the subject property, it was inescapable that the property would be permanently preserved both as a place of honor and as a burial ground.  In the Commission's view, the preservation of a place in perpetuity in honor of an event or persons is what defines a memorial[16].

---

[14] No party argued that any other use was appropriate for the subject property, and it was generally acknowledged, for a combination of reasons related to its location, the area market and the presence of the crash site, that the property could not be used for retail, commercial, office or residential purposes (other than perhaps a large-tract home site which Gregory Jones considered but then eliminated due to difficulty with septic systems (Trans. 10/10, p. 99)).

[15] "The site of the crash became a place of impromptu gathering where the public memorialized and commemorated these events while they struggled to comprehend their meaning." (Ex. KK2, p. i).

[16] A "memorial" is defined as "something designed to preserve the memory of a person, event, etc." Webster's College Dictionary.

We reached this conclusion that the use of the property as of the date of the taking was as a memorial without regard to or reliance on the legislation enacted by Congress in 2002, Pub. L. 107-226 or the status of the Government's permanent memorial project. The evidence in the record, independent of the Government's project, convinces us that whether the Government ever acted or not, this site was committed after September 11, 2001 to be a memorial. We also recognize the different opinion of Mr. Jones, who concluded that the subject property was not a memorial on the date of taking because of the absence of a statue or monument at the site. In our view, no formal marker is necessary at this site to establish it as a memorial. Mr. Jones himself acknowledged in his report (Ex. 7) that at least six acres of the subject property "is likely to be preserved undisturbed as sacred ground in perpetuity" (Ex. 7, p. 10) and would be "left undisturbed in perpetuity, in memoriam, as sacred ground" (Ex. 7, p. 29). No other use was made of, or proposed for, the property after September 11, 2001. That notion of permanent preservation to commemorate events and persons is the essence of a memorial.

       d.     The Commission's Determination of Highest and Best Use

The Commission then turned to apply the four criteria of the highest and best use test to the three uses: 1) pastoral/agricultural/recreational use; 2) a private memorial; and 3) a museum/visitor/center.

The Commission first considered whether the uses were "physically possible". As to the pastoral/agricultural/recreational use, there was testimony that some activities would not be possible on the subject property due to the mining activity that has occurred on the property. Mr. Jones testified that due to the acid left in the soil after strip mining, the property was not conducive to farming or growing crops. (Trans. 10/10, p. 151-152). Mr. Bell testified that he considered and eliminated several alternative uses in his analysis. (Trans. 10/9, pp. 71-72).

There is also the presence and impact of the crash site itself on the property, which would limit uses. Given these physical restraints, no pastoral (grazing) or agriculture use could be made of the property, but the Commission concludes that open space and some limited recreational use would be physically possible on the subject property. The Commission concluded that the presence of the crash site would also preclude any coal mining on the property as inappropriate. (See Trans. 10/8, p. 117; "I never would have considered mining the coal on this property after what took place on the site." (Mr. Svonavec)).

There was no dispute between the parties that both a private memorial and a museum/visitors center would be "physically possible" on the subject property, it being acknowledged by both sides that the size, dimensions and topography of the property were suitable to the construction of a memorial or museum/visitors center. The testimony pointed to some disagreement between the parties regarding landowner responsibility for and the cost of such items as road access to the site, the availability and cost of water and sewer utilities and the need to and cost of remediating environmental contamination on the small, 3.3 acre portion of the site. While there were differences of views relating to the risks, uncertainty and costs presented by these factors, neither party offered the conclusion that these or any other conditions of the property would make it physically impossible for the development of a memorial or a museum/visitors center. The Commission therefore concluded that open space/recreational use, a private memorial and a museum/visitor center would all be physically possible on the subject property.

The Commission then considered whether the uses were legally permissible. We concluded that the open space/recreational use would be legally permissible on the basis that there are little if any legal impediments to such uses and no evidence to the contrary was

introduced at trial. As to the private memorial and museum/visitor center uses, it was undisputed that Somerset County has no designated zoning that is applicable to the subject property, which means there are no existing zoning restrictions that would preclude a memorial or a museum and visitors center. Both parties agreed that any development --- whether a memorial or a museum/visitor center --- would be required to meet certain development standards and require governmental approvals. While there was some difference of opinion as to the degree of risk or difficulty that compliance with those standards could pose, no party pointed to any development standard that would preclude a private memorial or museum/visitors center on the subject property. We considered as well whether the need for offsite road improvements and the presence of environmental contamination on the subject property would pose a legal impediment to the uses, and concluded that while there could be costs that a buyer might incur to address the issues, it did not make the uses legally impermissible.

The Instructions to the Commission provide that in considering a proposed use, the Commission is to determine whether there was demonstrated a demand or prospect of demand for such use on the subject property in the reasonable near future. (Instructions, p. 9-10). We find that demand for the property as open space or recreational use was shown. Mr. Jones testified to sales of other like properties in the relevant market, as part of his comparable sales analysis, (Ex 7, p. 32-44; Trans. 10/10, p. 135-154), which showed the presence of buyers in the market for these uses. This evidence showed that there is demand for open space or recreational use on the subject property.

The Commission finds that demand for a private memorial was also demonstrated. The evidence in the record shows that people visited the subject property in consistent numbers before, during and after the time that a temporary memorial was in place on the site. The

evidence indicates that the visitation to the site was spontaneous and impromptu. (See, e.g., Trans. 10/7, p. 62). There is little if any doubt that, once the crash of Flight 93 occurred on the subject property, a memorial of some type would be present on this property. In particular when the prospect of a memorial project being undertaken by the Government is eliminated from consideration, as required by the "scope of the project rule", the Commission is convinced that demand for a private memorial existed on the date of taking and would continue into the reasonably near future.

There is less direct evidence in the record as to the demand for a museum or visitor center on the subject property. The information as to other sites of historical significance or public interest referenced in Mr. Bell's case studies (Ex. C, pp. 36-37), and the LECG Report (Ex. 102, p. 149), however, shows that some type of a museum or visitor center is typically developed in connection with historical events of this nature and placed at or near the location of the historically significant events. The closest examples we saw in the evidence were the USS Arizona Memorial at Pearl Harbor, Oklahoma City and Ground Zero (where a museum and visitor center is planned). Suffice it to say that the evidence in the record as to the other sites persuades us that, wholly apart from and without considering the Government's project for the development of a public Flight 93 museum or visitor center, there would be demand for a museum and visitor center at or near the site of the Flight 93 crash, for which the subject property could be used.

The Commission then considered the third criterion in the highest and best use test: financial feasibility. The Commission found that financial feasibility of an open space/recreational use was demonstrated. Based on the demand for other properties in the area for similar uses, the Commission concluded that it would be financially feasible for the property

to be devoted to open space or recreational use. Common sense says that the property has positive value as open space/recreational land, and the Commission accepts the value ascribed to it by Mr. Jones in his appraisal report for that use on the basis that his valuation of the property as open space at $610,000 was not contradicted in the record.

Turning to the other uses, the Commission could not conclude on the basis of the record presented that a museum/visitors center was financially feasible. The Commission's conclusion is based primarily on the absence of sufficient reliable information in the evidence or from the testimony of any of the witnesses to determine whether a museum/visitors center operation on the subject property would be financially viable. The Government and the Landowner reached opposite conclusions on this question, but in our view, neither Mr. Bell's valuation nor Mr. Jones' sensitivity analysis were sufficiently supported to be accepted by the Commission. Neither analysis had the benefit of or was supported by a marketability study from a qualified provider showing and evaluating the costs, expenses and risks of constructing and then operating a museum/visitors center on the site. As a result, the Commission was left with uncertainty about the design of the museum, its suitability for the site and market, and the contents of any museum. Without that information, the Commission could not accept the projected visitation numbers used by Mr. Bell or Mr. Jones or be persuaded that, for example, Mr. Bell's $300 a square foot construction estimate, lack of costs for artifacts or 30% expense ratio were plausible. Nor for similar reasons were the components of Mr. Jones' analysis convincing. Without the benefit of a credible study from an accepted authority or a better description of the museum and its operation, the Commission was unable to discern whether, for example, Mr. Jones' reserves, marketing expenses or profit and overhead estimates were plausible.

While Mr. Bell and Mr. Jones each did their own review and analysis of information they gathered from other selected museum sites, neither witness had the expertise or the experience to assess the feasibility of a planned museum. Mr. Lennhoff criticized Mr. Bell's report for its lack of a marketability study (Trans., 10/9, p. 162-164) but his criticism is equally applicable to Mr. Jones' sensitivity analysis. Similarly, Mr. Svonavec testified to his background and the *pro forma* plans he did for a memorial and visitors center, but Mr. Svonavec had never developed a museum or visitors center and his experience was largely in mining and industrial-related projects, not in retail projects or developments that rely on public patronage (other than possibly residential dwelling developments that are not comparable). Although the testimony indicated that a museum might be a relatively simple operation, the Commission did not think that any of the witnesses had sufficient education or experience or supported their reasons sufficiently for the Commission to accept their conclusions about the financial feasibility of a museum/visitor's center. (*See* Instructions, p. 5).

Applying the third criteria of financial feasibility to the memorial use, the Commission finds a private memorial is financially feasible. The Commission concludes, from the evidence in the record, that a private memorial could be constructed and managed on the subject property at a cost that would generate positive revenue and provide a return to a buyer or investor. On the basis of the same analysis, as explained below, the value of the property as a private memorial is higher than its value as open space/recreational land, and the private memorial use is found to be "maximally productive". Therefore, applying the fourth criteria of the test, the Commission determined that the highest and best use of the subject property is as a private memorial.

The Commission is aware that the Instructions provide that "[v]arious parts of a single property may have different highest and best uses as long as these uses are not inconsistent." (Instruction, p. 10). The Commission considered whether different uses on parts of the subject property would be appropriate. As the Instructions provide, any multiple, various uses "must be compatible" and "capable of being utilized simultaneously." (Id.). We considered whether other surface uses of the subject property would be compatible with its highest and best use as a private memorial. We also considered the 8 acres of coal and oil and gas interests held by the Landowner in the subject property. As to other surface uses, in our view, using a portion of the property for a private memorial and the rest of the surface for some other use would not be compatible. *See also* Jones Report, Ex. 7, p. 29 ("the entire site should be used to ensure fitting environment for the memorial"); Ex. 7, p. 19 ("Suffice it to say, any buyer of the property would likely be expected to keep a respectable distance between the impact site and any incompatible use."). As to the 8 acres of coal, the evidence in the record was that any coal would be strip mined and the Commission finds that such activity would not be consistent with the highest and best use of the property as a private memorial. As to oil and gas, the parties stipulated that the oil and gas interests had a value of $105,000 and therefore agreed that the interests had value. Although the Commission was not provided with the details the of the parties' stipulation, implicit in the stipulation is that the means of extraction to realize the value of the oil and gas interests would not be inconsistent with the respective highest and best use that each party applied to the property, whether open space or as a museum/visitor center. On that basis, the Commission concludes that the oil and gas interests have value and its realization is compatible with the highest and best use of the property as a private memorial.

3. **Determination of Value**.

a. Instructions on Determination of Value

Having determined the highest and best use of the subject property, the Commission then turned to a determination of value. In making its determination of value, the Commission was mindful of the Instructions it received. The duty of the Commission is "to determine the just compensation," meaning the fair market value of the land or interest taken by the Government. (Instructions, p. 7). "Fair market value means the amount in cash, or on terms resembling the equivalent to cash, for which in all probability the property would have sold on the effective date of the taking, after a reasonable exposure time on the opening competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the taking." (Instructions, p. 8). The Instructions provide that "[c]are also must be exercised to distinguish between income directly attributable to the land and income from a business conducted on the property." (Instructions, p. 12). "A property owner is not entitled to damages for business or personal losses due to the taking of the property." (Instructions, p. 12).

b. Assessment of the Expert Appraisals

In light of the Instructions, and in particular the admonitions regarding the "scope of the project rule" and to exercise care to distinguish between income attributable to land from income attributable to business, the Commission could not accept the valuation provided by Mr. Bell in his appraisal report. Mr. Bell undertook to value a museum and visitors center as a means of arriving at a valuation of the land as of the date of taking. In our view, however, the description and details of the museum use were not sufficiently supported and the components of his

approach incorporated the business elements of a fully-developed museum/visitors center without allocating value to the land; nor could the Commission, for the reasons presented here, accept the notion offered by Mr. Bell that all of the elements included in his analysis were attributable to the land. (*See* Trans. 10/11, p. 24).

As noted above, the Commission thought that Mr. Bell's (and Mr. Jones') analysis lacked sufficient support and expertise for a substantiated assessment of a museum operation, and suffered from a lack of a marketability study by a qualified provider to provide reliable information and analysis. Among other consequences, this resulted in a description of the museum, including its structure, operation and content, that was vague and ill-defined.

More fundamentally to the task before the Commission, Mr. Bell's valuation calculation relies on several components that cannot be reconciled with the "scope of the project rule" or the distinction the Commission is instructed to honor between income attributable to the land and income from a business. First, Mr. Bell's valuation relies on assumed visitation of 230,000 people a year, and his testimony makes it clear that he viewed 230,000 visitors as part of the "intrinsic value" that belonged to the land on the date of the taking. (See Trans. 10/11, pp. 12-13; p. 24). The Commission could not accept that assumption based on the evidence in the record. The "stabilized" estimate of 230,000 visitors is the number projected in the Lord Report for a fully-developed memorial and museum/visitors center, and one operated by the National Park Service. The Lord Report was commissioned by the Government in furtherance of its development of a public Flight 93 memorial and the number of visitors projected in the Report is based on that project. Mr. Bell's valuation, therefore, relies on information and support that the Commission is precluded from adopting by the "scope of the project rule." Independently from that limitation, we also note that there is no evidence in the record that 230,000 visitors ever

visited the site in any year as it existed prior to the date of taking. The projection of 230,000 is therefore necessarily based on an assumption that people would come to the site in higher numbers as a result of something being added to the property after the date of taking. What was projected to be added to achieve those numbers, moreover, are not simply improvements to real property that would be includable in a land value: the projection is based on the addition of an ongoing, functioning museum operation with assumed content in the form of displays, films, a theater, artifacts, *i.e.*, content that is part of a business operation and not fairly attributable to the land. (See Trans. 10/9, pp. 111-115). In other words, we cannot accept the premises of Mr. Bell's analysis that visitorship as high as 230,000 a year is intrinsic to the real estate when the only record evidence of that number in relation to the subject property is a projection for a Government-operated museum operation.

Similarly, Mr. Bell relied on a $9.00 admission fee that was based on full admission prices at operating museums, reflecting the revenue collected at those locations from customers paying to see the content of the museum. As noted above, the nature of the content envisioned for a museum on the subject property was vague, but it is the relationship of the admission rate used by Mr. Bell to the museum business that results in the injection of business valuation rather than land value into the calculation. Critically, Mr. Bell's analysis made no allocation between business value and land value, as required by the Instructions the Commission is to follow. Mr. Bell's valuation also relies on book sales and concessions revenue received from direct-exchange purchases for those items, which in our view further incorporated elements of business income and is unacceptable for the same reason.

To these components, Mr. Bell then applied a capitalization rate of 7%. In our view, a capitalization rate of 7% does not reflect the risks involved with a museum/visitors center

operation on the subject property, and would not be applied by a willing and knowledgeable buyer considering what to pay for the land. It is not acceptable to the Commission, consistent with its Instructions, to determine the land value of the subject property by adopting business-based visitation numbers and admission fees, and adding business revenue from sales of goods, but then setting aside all of the business risk associated with that revenue and using a valuation-generous capitalization rate of 7% typically reserved for safe, established land valuations with ascertainable track records and relatively minimal risks. It appears to us that Mr. Bell fully valued a museum business (we cannot see what would be added to the visitation numbers, capture rate, admission fees or book concession revenue if that were not the case), and then applied a cap rate of 7% and attributed it all to land. We could not accept that approach as consistent with the Instructions and the applicable definition of fair market value.

For reasons mentioned above, the Commission could also not accept the valuation provided by Mr. Jones in his appraisal report. As noted, Mr. Jones sensitivity analysis suffers from the same lack of support as Mr. Bell's analysis and the Commission could not accept Mr. Jones conclusion that the subject property should be valued as if the crash of Flight 93 had never occurred. Unlike Mr. Jones, the Commission concludes that the use of the subject property on the date of the taking was as a memorial, and finds that a private memorial is its highest and best use. Our review of the evidence convinces us that a private memorial is a viable use and the property had value as a private memorial on the date of the taking that would be more than its value as recreational land or open space.

c. The Methodology Accepted by the Commission

The Instructions refer to three appraisal methods acceptable in federal eminent domain actions: 1) the comparable sales approach; 2) the income capitalization approach; and 3) the cost

approach. (Instructions, p. 10).[17]  Although comparable sales offer the best evidence of fair market value, "the law is not wedded to any particular formula or any particular method for determining fair market value as the measure of just compensation." (*Id.*). The method employed must have a bearing on what a willing buyer would pay a willing seller on the date of the taking. (Instructions, p. 11).

As the Instructions state, the suitability of the sales comparison approach is tied to the determination of highest and best use, *i.e.*, comparable sales are sales in the same time frame of other properties of the same or similar use. Here, the Commission determined that the highest and best use is as a private memorial, but there is no evidence in the record (and it may be that none exists) of sales of other private memorials. For this basic reason, the sales comparison approach is inapplicable.

The Instructions tell us that in the absence of evidence of comparable sales, other methods of valuation may be used including the income capitalization approach. (Instructions, pp. 11-12). The Instructions state that, of several income capitalization methods, the "'land residual technique' is the only income approach at issue in this case." (Instructions, p. 12). As explained, the land residual technique is a method of estimating land value in which "the net operating income attributable to the land is isolated and capitalized to produce an indication of the land's contribution to the total property." (Instructions, p. 12).

Based on these Instructions, the Commissioners accept the basic methodology of arriving at value by capitalizing the income attributable to the land. To isolate the income attributable to the land, this method calculates revenues based on visitation and entrance fees attributable to the land being used as a private memorial but excludes visitation and revenue projections

---

[17] The parties were all in agreement that the "cost approach" was inapplicable to the valuation of the subject property.

attributable to a museum or other business. Revenues attributable to items such museum content or concessions/souvenirs and like items are deemed to reflect a business enterprise and not given further consideration. Expenses for a private memorial use are i n c l u d e d based on t h e testimony and evidence entered into the record to the extent the items are directly related to the real estate. As explained below, the capitalization rate used in the determination considers the testimony of both experts, as well as industry publications entered into evidence. Direct capitalization of the net land income is accepted as a credible and appropriate method for arriving at a value conclusion for this property and on the basis of the record before the Commission.

This approach, the Commission believes, reduces the number of variables, particularly those showing the least support. T h e e liminated variables include an admission capture rate for visitation, net revenue from concessions/souvenirs, several expense items, and the costs for the design, scale and development of a museum operation. The analysis does require estimates relative to visitation, entrance fee, real estate expenses, capitalization rate, and site improvement costs for a private memorial, all of which, as explained below, are based on the record evidence available to the Commission.

The key to the Commission's determination of value was defining the characteristics of the subject property as of the date of the taking and applying the definition of "fair market value" to those characteristics, based on the evidence available in the record and consistent with the other admonitions in the Instructions. In our view, as of the date of the taking, the subject property was a memorial, committed by the events that lead to the crash of Flight 93 on September 11, 2001 to being preserved in perpetuity as a memorial to events of that day and the heroes of Flight 93. As of September 2, 2009, the subject property had an eight-year history of

consistent visitation of between 117,000 and 167,000 people with a temporary memorial on the site. The subject property is the location of the crash itself. The subject property was acknowledged to have the best vantage of the crash site, (see LECG Report, Ex. 102, p. 55) ("The site is also unique because the plane crashed on the Subject Property, distinguishing it from nearby land"), and given its sloping topography, it was the preferred location for viewing the crash site. (*See* Jones Report, Ex. 7, p. 27; discussing other possible sites, but concurring that a portion of the subject property "might be the preferred location for a memorial"). Stated in reverse, the Commission could not accept the view that the subject property should be viewed as if the crash had not occurred there, that it did not have the preferred vantage of the site of the impact or that it had not been generating 117,000 to 167,000 visitors a year over an 8-year period. Nor, consistent with the Instructions or on the basis of the evidence presented, and for the reasons stated above, could we value the property on the basis of a museum business. The Commission accepts the view that on the date of the taking, the property was a memorial, to be preserved as such, that resulted in 117,000 to 167,000 visitors a year and that a willing and reasonably knowledgeable buyer would be willing to pay for the value created by those characteristics. Our task was then to determine that value from the evidence and the record before us, mindful that "only income directly attributable to the land is relevant to fair market value." (Instructions, p. 12).

With that background, and having determined that the maximally productive use of the property was as a private memorial, we undertook to ascertain what factors, calculations and assumptions a willing and reasonably knowledgeable buyer would consider in arriving at the price to pay for the subject property with those characteristics as of September 2, 2009. We concluded that a willing buyer would determine the price based on the capitalized net income

that could be received from a minimally-developed memorial taking into account the capital expenditures for a memorial, the expenses to operate the memorial and an assessment of any adjustment appropriate for the risk factors related to the development of a private memorial. The conclusion we reached is that the private memorial would be located on the subject property, have an optimum vantage of the crash site and provide an organized venue for observation, reflection and placement of mementos. The real estate improvements would include a viewing area, off-road parking, lighting and restroom facilities.

d. Calculation of Value

As to net income, we concluded that a willing and reasonably knowledgeable buyer would determine the net income from a private memorial by assessing the number of visitors to the site, the evidence of an appropriate admission fee to the memorial and the expenses required to manage the private memorial.

1) Visitation

There was a period of 8 years between the crash of Flight 93 on September 11, 2001 and the taking of the subject property on September 2, 2009. There is no dispute in the record that during that time, the actual number of people who visited the site was between 117,000 and 167,000 each year. (See, e.g., Lord Report, Ex. FF7; Jones Report, Ex. 7, p. 21; NPS General Management Plan, Ex. KK2, p. III-5; LECG Report, Ex. 102, p. 48; NPS Report, Ex. FF6; USRPT005116; Trans, 10/10, p. 53 (K. Newland)). The evidence indicated that most if not all of those visitors went to the subject property[18]. During essentially all of this time (between October 2001 and until sometime in the Fall of 2008 when the NPS terminated a License Agreement with

---

[18]   While there was discussion in the testimony of other adjacent sites and the extent to which the crash site was viewable from them, there appeared to be a general acknowledgement that the subject property, on which is located the point of impact, provided the best vantage of the crash site itself and in any event, given the its access by Skyline Road, open field terrain and sloping topography, the subject property is the property that visitors went to during this 8-year period before the taking.

56

the Landowner; Trans. 10/8, p. 43), there was on the property only a temporary memorial consisting of a small graveled parking area, a viewing location and wire wall for placement of mementos. The statistics in the record show that visitors came to the site in comparable numbers each year prior to the date of taking, and in 2007 through 2009, the three years immediately prior to the taking, the number of visitors were 143,725, 136,091 and 149,668, respectively. (USRPT005116). This evidence shows a consistent number of visitors to the site over a meaningful period of time when it had minimal improvements, sufficient in our view to demonstrate that, as of the date of taking, the property in its then condition had sustainable attendance of 120,000 - 160,000 visitors per year.

There is other support as well in the record for the proposition that, as of the date of the taking, the subject property was such that it could continue to garner sustainable visitation. Mr. Jones said in his Report (Ex. 7) that the fact that between 117,000 and 165,000 visitors had been to the site annually was "reason enough" for a prospective buyer of the subject property to believe that the property would attract a substantial number of visitors to a privately operated memorial visitor center/museum if one were built. (Ex. 7, p. 21).

At the same time, the evidence in the record shows that the actual number of visitors to the site prior to the date of taking was never more than 167,000 in any year and that number occurred in 2006, the fifth anniversary of the 9/11 events. (Ex. FF8). The projections of higher numbers of visitors in the record (as high as a peak of 400,000 a year and the stabilized estimate of 230,000, for example, in the Lord Report, Ex. FF7, p. 6-7) are all for later, future years and are all based on the installation of permanent improvements such as a museum or visitor center. In other words, the higher numbers are projections based on the addition of something not present on the subject property on the date of taking which would be anticipated to draw a higher

number of visitors. In the view of the Commission, those higher visitor numbers are not only estimates but are attributable, not to the site as it existed on the date of the taking, but to the further possible improvements and amenities. Equally important, the estimates of higher visitation are based on the addition of a fully-developed museum with content to attract larger number of visitors. In our view, to include those higher estimates of visitor numbers in our determination of value would introduce conjecture into the analysis and incorporate measures of business value rather than land value. We also noted above that the estimate of 230,000 visitors a year was made in the Lord Report which was generated as part of the Government's project and is outside the evidence the Commission can rely on under the "scope of the project rule". The Commission accepts that as of the date of taking, the subject property was the location of the crash of Flight 93, that as a result of that event, the property was a memorial to be permanently preserved and, as such, the property attracted a consistent number of visitors to the site. The numbers range between 117,000 and 165,000 for the period prior to the taking. (See also, Jones Report, Ex. 7, p.13) ("As of the date of valuation, the Flight 93 memorial temporary visitor's center is handling about 150,000 visitors annually … .").

Focusing on what we think would be relevant to a willing and reasonably knowledgeable buyer, we considered the following evidence. The average visitation to the subject property in the first five years after the crash of Flight 93 was 137,000. (See Ex. 102, p. 48). Higher numbers occurred in the fifth anniversary year (167,000). In the three years preceding the taking in 2009, the visitation ranged between 136,000 and 149,000 annually. We concluded that a willing and reasonably knowledgeable buyer presented with this information would use 136,000 as the visitation number for determining value. That number equates to the average visitation in the first five years and is the low end of the three most recent years, indicating a

level that is likely to be reliably repeated for a private memorial in the future. We acknowledge that the actual number of visitors in the three years preceding the taking in fact could argue for a higher estimate than 136,000. We are of course cognizant as well, however, that visitors going to the site between 2001 and 2009 were not charged a direct fee to view the site. Inherent in our analysis is acceptance of the proposition that people would pay a fee in some amount for entrance to a private memorial and access to an organized viewing location from which to see the site and pay their respects. The proposition is supportable. See, Jones Report, Ex. 7, p. 29 ("There is no question of the event's historical significance, and little doubt that a memorial would be well attended by fee-paying visitors."). We chose 136,000 (the low end of the visitation in the 3 years prior to the taking and the average in prior years) and not a higher number as the best indication of sustainable attendance to a private memorial from the actual numbers in the record and to account for possible reductions in attendance from the more recent trend for a fee-based memorial. We note as well the uncontroverted evidence in the record that no advertising occurred when between 117,000 and 167,000 people were visiting each year.[19]

We did not apply a percentage to the visitation, or a "capture rate" since we are measuring the value attributable to the visitors coming to the site as of the date of taking, not what percentage of those visitors who come to the site would patronize a separate development (such as a museum or visitors center) that is not part of our analysis.

---

[19] The record includes a Final General Management Plan prepared by the National Park Service in June 2007 and that report projected that if the site was left undeveloped, the number of visitors was projected to be an average of 87,000 a year. (Ex. KK2, p. iv). The Plan was generated by the Government as part of its project for a public memorial and is outside the evidence the Commission can rely on under the "scope of the project rule". That said, we would not rely on it if we could consider it. The number in the Plan is itself a projection and is at odds with the number of actual visitors to the site through 2009 that are in the record. We also note that the actual visitation numbers for 2007 through 2009 were not available at the time of the June 2007 NPS report.

2) Admission Fee.

The question here is what would a willing and reasonably knowledgeable buyer conclude that visitors would pay for a minimally-developed private memorial on the subject property? The Commission was careful in this exercise to avoid any valuation of a larger business enterprise, such as a museum, that could be potentially conducted on the property. For these reasons, the Commission did not use, as the basis for a fee for a private memorial, the evidence in the record of fees paid for entrance into fully-developed museums or visitor's centers at other locations, many of which are operated by the Government. That information, however, did help the Commission conclude that the proper fee for its analysis would be less than the admission fees at $7.00 and above that were referenced in the evidence for admission to fully operational museums and similar operations.

In his rebuttal testimony, Mr. Bell provided his "kiosk" example in which he posited that if a wall were constructed around the site such that access was available only through a kiosk and there was a charge to enter through the kiosk, no one would deny that that value was associated with the land. (Trans. 10/10, p. 233). When asked what the charge would be to enter through the kiosk under his hypothetical kiosk example, Mr. Bell testified that he was comfortable with a charge of $5.00. (Trans. 10/11, p. 26-27). He emphasized that he did not think the arrangement was the highest and best use of the property, but testified that in that scenario $5.00 would be an appropriate charge. In his response to the question, Mr. Bell referenced the LECG (Cook & Kabat) report as the source of or support for the $5.00 fee. (Id.). The Commission's own review of the LECG report, however, shows that that is not correct. Cook and Kabat said that their estimate of the charge for admission to a temporary memorial (without the development of a full museum or visitors center) was estimated to be "$5.00 per car with an assumed three

passengers" in the car, (*See* Ex. 102, p. 57), which equals a charge of approximately $1.67 per person. Cook and Kabat do not reference any support or other location as an example for a per car charge. It appears to be their best estimate of a possible charge for a memorial, but it does provide record evidence of the low end of a range for a fee to a minimally-developed memorial. The Cook and Kabat report does refer, as support, to the Ground Zero site in New York where a $5.00 charge was in place for access to the temporary memorial. (*See* Ex. 102, p. 57). Based on that information and the record evidence before the Commission, $5.00 would be the high end of the range for an admission fee to a memorial.

The Commission thinks that, for reasons related to generally known differences in the two markets and the relative remoteness of the subject property, the charges for access to a memorial on the subject property would not be the same as those charged for the Ground Zero site in New York City, but would be less. We also note that the Cook and Kabat report states that actual revenue received from admissions at other historical sites visited by the public is typically $1.00 or so below the quoted admission fee. (Ex. 102, p. 57). This is due to discounting of the admission fee for seniors, children, group rates, school field trips and similar arrangements. This tells us that the actual amount of the admission fee is not $5.00 but less than $4.00, and we believe that a willing and reasonably knowledgeable buyer determining a price to pay for the subject property would rely on calculations of the actual revenue to be expected rather than the quoted fee. For all these reasons, we think the admission fee for a private memorial on the subject property would be higher than the low end of $1.67 a person but less than $4.00, and the Commission selected $3.00 as the appropriate admission fee for its analysis.

3) Gross Income.

Using an estimate of 136,000 visitors and an admission charge of $3.00, the Gross Income for the analysis is $408,000.00.

4) Expenses.

A willing and reasonably knowledgeable buyer would next need to include the minimum expenses required for a private memorial on the subject property. Consistent with the approach being adopted, the Commission did not include expenses for the operation of a fully-developed museum or visitors center but only those real estate expenses required for a minimally-developed private memorial. The expenses we focused on are those that would be required to secure and insure the site and provide for an organized viewing opportunity for those who visited the site. The real estate expenses included were for sewer/toilet facilities, grounds keeping, security, management, insurance, snow plowing and property tax.

The Landowner provided estimates for these types of expenses through the testimony of Mr. Svonavec, who explained the sources for the estimates he included. We found that testimony credible and used the Landowner's estimates as the basis for these expenses, cognizant of Mr. Svonavec's expectations of between 200,000 and 300,000 visitors in his estimates (*see* Ex. AA31, p. 4617). Adjusting where appropriate for differences in the visitation number used, we identified expenses as follows:

| | |
|---|---|
| Sewer/Toilets | $25,568 |
| Grounds Keeping | $20,000 |
| Security | $65,160 |
| Manager | $40,800 |
| Insurance | $35,000 |
| Snow Plowing | $ 6,000 |
| Property Tax | $ 1,800 |

We recognize that the Landowner's estimate for sewer/toilets was based on an estimate of between 200,000 and 300,000 visitors, or a mid-range estimate of 250,000. (See Trans. 10/8,

p. 6)[20]. We adjusted the estimate for our analysis using 136,000 visitors by taking Mr. Svonavec's total calculation for sewer/toilets, which was $47,150, and dividing it by 250,000. This resulted in an expense of $.188/person, which we them multiplied by 136,000 to arrive at $25,568.00.

The grounds keeping charge is the same as used by Mr. Svonavec since it is not subject to variation based on the number of visitors. For security, we used the same number that Mr. Svonavec estimated for 3,620 hours annually for security personnel at $18.00 an hour (Ex. AA31; Trans. 10/8, p. 31-32).

For the management expenses, we considered that a minimally-developed private memorial would require limited personnel (in addition to grounds keeping and security that are separately included) and equated it to a real property management charge. Mr. Svonavec's estimate included multiple personnel and management positions for a fully-developed museum. We looked at and considered the management fee typically charged for real estate management and compared the total charges included by Mr. Svonavec in his analysis for management, maintenance and ticket booth personnel, which were in the range of 6.6% to 10% of his estimated revenues (Ex. AA31). On the basis of this information and evidence, we chose 10% as the appropriate management fee that we think a reasonably knowledgeable buyer would include in determining the value of the property under this analysis.

With respect to insurance, we used the estimate provided by the Landowner for the museum building, (Ex. AA31; Trans. 10/8, p. 30) because the record does not contain any other estimate for insurance that the Commission could employ, but more to the point because general experience and common sense tells us that most of the cost of the insurance would be for liability

---

[20] While identified by Mr. Svonavec as "sewer" (Ex AA20, p. 292), the costs used reflect the costs for hauling and disposal of sewage from holding tanks connected to the toilets.

protection which would be required for either a private memorial or a museum building with public attendance.

The property tax is the real estate tax payable on the subject property as of the date taking without any discounting for the Clean and Green status of the property, (see Ex. 7, p. 13-14) based our assumption that the Clean and Green status could be terminated but that the minimal improvements from a memorial would not materially increase the assessed value of the property.

The total of these expenses is $194,328.00

   5)   Net Income.

Based on the foregoing, the net income is calculated at $213,672.00 (Gross Income of $408,000.00 less Operating Expenses of $194,328.00).

   6)   Capitalization Rate.

The capitalization rate used in a valuation reflects the return that a willing and knowledgeable buyer would expect from a stabilized project to be placed on the property accounting for the risks and opportunities related to the future income stream. To plainly state it, the lesser the risk that the return will be achieved, the lower capitalization rate. Mr. Bell used a capitalization rate of 7% in his valuation; Mr. Jones used 12% in his sensitivity analysis. For the reasons explained, the Commission decided to use a capitalization rate in its analysis of 10%.

The Commission used 10% as the capitalization rate because we are valuing only the land component and have not included any of the greater business or real estate risks associated with the possible development of a museum or visitors center. For that reason, we did not use a capitalization rate at a level used by Mr. Jones. We are also using a visitation number (136,000) that is supported and demonstrated by actual events and is not dependent upon projections of higher visitation numbers based on future anticipated improvements or business activity that

would carry a higher risk of non-occurrence and possibly warrant a higher capitalization rate. We explained above why we did not find Mr. Bell's capitalization rate of 7% suitable for the valuation of the subject property.

The LECG Report in evidence used a "terminal capitalization rate" of 6.5% (Ex. 102, p. 64). That Report, however, employed a yield capitalization or discounted cash flow methodology and in LECG's analysis, the rate was being used to calculate the value of the land at the end of an assumed holding period. (Ex. 102, p. 64). As such, the rate was measuring a categorically different risk, and one in which, because it is predicated on a ground rental, the investor's downside risk is protected by the fact that if there is a default (i.e. the risk occurs) the investor gets back the entire property, including the land and all building improvements. Those same circumstances are not present in the methodology now being applied to the subject property. For those reasons, the rate used in the LECG Report is not suitable for use as the capitalization rate in the present valuation of the subject property.

The Commission considered not only the rate spread of 7% to 12% presented by the experts, but also the other data introduced at trial, including the <u>Korpacz Real Estate Investor Survey</u> (Ex. X11) and the RealtyRates.com <u>Investor Survey</u> (Ex. X), for the periods coinciding with time of the taking[21]. Mr. Bell chose to focus on rates related to office and retail properties. The Korpacz Survey (page 92, Institutional Grade vs. Non-institutional Grade Property Rates) identifies an average suburban office cap rate of 10.16% and an average strip shopping center rate of 11.31%. RealtyRates.com reports an office cap rate of 9.33% and a retail cap rate of 9.23%. RealtyRates.com also reports a cap rate of 11.27% for special purpose properties, and

---

[21] As to the Korpacz Survey we used the Survey for the 4th Quarter 2009 that was introduced by the parties and relied on by both experts. RealtyRates.com Investor Survey reports for two different quarters were introduced into evidence, Exs. X and X1. We used the RealtyRates.com Report published for the 4th Quarter 2009, which as the Report states includes the data for the 3rd Quarter 2009 and covers the period during which the taking occurred. (Ex. X, p. 011119).

10.16% for ground leases associated with special purpose properties. (Ex. X, p. 38). This data, which includes adjustment for non-institutional grade properties, narrows the range to between 9.23% and 11.31%. Considering all of data and testimony presented, the Commission finds that a capitalization rate of 10% is supported and that a capitalization rate of 10% would be applied by a willing and reasonably knowledgeable buyer.

7) <u>Capital Expenditures</u>.

Here, the Commission determined the capital costs to be incurred for the development of a minimally-developed private memorial and again, as directed by the Instructions, kept the estimates to land value and avoided the introduction of improvements and expenses associated with the creation of a business. Based on the testimony, including what had been in place when the temporary memorial was on the subject property but assuming some additional improvements for a permanent private memorial, the items we determined would be required are a parking lot and viewing area, lighting, installation of toilets, legal costs and engineering.

We note that Mr. Svonavec, who testified for the Landowner, while not having experience in the construction and development of museums, did have relevant development experience for site improvements and provided sources in his testimony for some of the estimates he used. Finding these estimates credible and supported, we used the Landowner's estimate of these costs as a frame of reference for estimates for a parking lot/viewing area ($86,825; Ex. AA20, p. 291), lighting ($30,000; Ex. AA20, p. 290), sewer[22] ($47,400; Ex. AA20, p. 292), legal ($25,000; Ex. AA20, p. 290) and an estimate for engineering ($15,000). As to these items, the total of the Landowner's costs was $204,225.00.

---

[22] While labeled by Mr. Svonavec as "sewer", this item of cost reflects the installation of storage tanks and related permitting and engineering.

We did not include any costs for upgrades or improvements to the public access roads (such as might be required for a fully developed museum use or as Mr. Jones included in his sensitivity analysis). Mr. Svonavec testified that any improvements to public roads would be the responsibility of the township of Stoneycreek or state government. (Trans. 10/8, p. 14). Mr. Bell reached the same conclusion. (Trans. 10/9, pp. 70-71). The Commission finds that testimony credible, and there is no evidence in the record that improvements to the public roads were mandated. We also considered the history of the site and the attendance that occurred between 2001 and 2009 with the roads in the same condition as existed on the date of the taking. Tellingly, the visitation number used in our analysis (136,000) is equivalent to the number of visitors that were coming to the site at the time of the taking without any road improvements.[23]

The Commission also concluded that a willing and reasonably knowledgeable buyer would include a cost for the cleanup of the environmental contamination on the property. While the ultimate responsibility for those costs may rest with other parties, given the uncertainties of recovery from other parties and the prospect of delay in pursuing those responsible parties and resulting negative impact on the project, we determined that a reasonably knowledgeable buyer would include costs for the environmental remediation in determining price. The evidence in the record includes information from the estimate provided by Marks Environmental of $217,000.00 (Trans. 10/10, pp. 77-78), for remediation for non-residential purposes. There were higher estimates for remediation in the record but we concluded that this estimate was the one that a willing and reasonably knowledgeable buyer would find most applicable to the intended use and

---

[23] Mr. Newland testified that a traffic study generated by the National Park Service concluded that the existing roads were inadequate for the temporary memorial. (See Trans. 10/10, p. 31). Our review of the traffic study introduced into evidence (Ex. 98) shows that while it labeled the traffic to the temporary memorial as "adverse" to the quality of life of residents along the roads, its conclusions about the inadequacy of the roads were in relation to the projections for higher numbers of visitors to a permanent memorial or museum/visitor center.

we included that amount in the estimate of Expenditures.   On the basis of the foregoing, the total capital expenditures for a private memorial were calculated to be $421,225.00.

        8)  Discount Rate.

Based upon the evidence at trial, the subject property presented certain risks associated with the development of even a minimally-developed private memorial.  These risks are fewer than those inherent in the development of a museum or visitor's center but risks are nevertheless present in getting the project to a developed stage.  These risks include the need to obtain governmental approval for any development, whether it is the property owner or the state and local governments would bear the cost of any road improvements required, site issues, the effect of input and possible objections from the public and family members, and the risks of being able to obtain financing for the project.  Given the presence of these risks, the Commission determined that a willing and reasonably knowledgeable buyer would discount the price to be paid for the subject property to account for these risks.

In considering the discount that a willing and reasonably knowledgeable buyer would apply, the Commission reviewed the Korpacz Survey for the Fourth Quarter of 2009 (Ex. X11) which coincides with the time period during which the taking of the subject property occurred. Included in the Korpacz Survey, at page 57, are statistics relating to land development projects and discount rates being applied by investors in the then-current market to account for risk elements similar to those present with respect to the subject property, including the need for governmental approvals, environmental conditions, responsibility for off-site improvements, financing and risk of objections from members of the public to the development.

The Korpacz Survey states that the average discount being applied at that time was 19.67% for land development projects in which all entitlements were in place, meaning projects

that had obtained approvals. (Ex. X11, p. 57). The range of discounts for land development projects in the time frame was between 12% and 30%. The Korpacz Survey states that for projects without entitlements, investors increased the discount rate by between 400 and 1,500 basis points, indicating a range of discounts for projects without entitlements of between 16% and as high as 45% with the maximum adjustment. The Korpacz Survey focuses on residential development projects including single-family subdivisions and multi-family buildings. (See Chart DL-2, Ex. X11, p. 57). In addition to approval and entitlements, those types of developments have construction risk and sell-out (sale) requirements that not only present risk but take time to resolve. The Korpacz Survey states that the median absorption period for the projects in its land development survey was 84 months. (Ex. X11, p. 57).

The Korpacz Survey information is of some assistance, but there are differences between residential development projects and the development of a private memorial on the subject property. Both parties conceded at trial that any development on the subject property, including a private memorial, would require approvals and therefore a private memorial has some entitlement risks. On the other hand, a private memorial does not present any significant construction or sell-out risk, particularly when a willing and reasonably knowledgeable buyer can rely on the fact that a memorial was in place on the property, and being visited, for 8 years prior to the taking. Based on that demonstrated prior use, we believe a buyer would conclude that the construction and sell-out risk associated with the full development of a private memorial is less than that present with typical land development projects.

In determining the appropriate discount rate, we also considered the contributory value of the oil and gas interests in the subject property[24]. The parties stipulated that the value was

---

[24] As noted above, the Commission concluded that the mining of the 8 acres of coal was not consistent with the highest and best use and no contributory value was assigned to the coal.

$105,000 and a willing and reasonably knowledgeable buyer purchasing the subject property would acquire those oil and gas interests and the stipulated value. Factoring in this value means that the buyer would make less of discount adjustment than that applicable to typical land development properties where that oil and gas value is not present or its realization is precluded by the development to occur (i.e. residential housing).

In sum, the subject property poses some entitlement risk, little to no construction or build-out risk and includes the contributory value of the oil and gas interests. Based upon our review of this information and the evidence of discount rates cited above, the Commission concluded that a willing and knowledgeable buyer would make a discount adjustment of 12% and that the time for development of a memorial would be approximately one year, resulting in a 10.714% price adjustment[25].

There is one other point to note relative to the discount adjustment. In considering and arriving at the proper capitalization rate to use, the information we looked to, as a barometer, included capitalization rates in the market place in the 4th Quarter 2009 for office and retail projects. (See pp. 64-66 above). In assessing the appropriate discount adjustment, we looked at the discounts being employed by investors in the market place for land development projects. To an extent this is a function of the available information in the record, but more substantively, the capitalization rate and the discount adjustment measure different risks. The capitalization rate measures the anticipated return with all of the development risk behind the project: the return

---

[25] The actual discount used in the valuation is a function of the adjustment percentage for the risk of development and the amount of time the buyer/investor estimates is required for the project to reach the point that it is developed and producing the anticipated income. In effect, the investor compares the project on the table to one that has no risk and is "ready to go" on the date of acquisition, and adjusts by a percentage for the risks present and an estimate of the time to get to full development. The investor wants to calculate what he or she has to pay now to be in the same place when full development occurs. This is computed by calculating the present value of the right to receive an amount, at a point in the future, taking into account the risk associated with the future receipt: e.g. a 15% risk percentage and a one-year time horizon results in a price adjustment of 13.04% (15 ÷ 1.15).

expected from a fully-developed project. It is a measure of the income and the risk to the investor that the income will not be achieved (e.g., fluctuations in the number of visitors). The discount adjustment measures a different risk: the risk that the development will not occur as forecasted between the time of acquisition and the time of full development. As to the discount adjustment, land development adjustments being applied in the relevant time period is the most relevant to this component of the valuation.

      e.      <u>Summary of Valuation.</u>

On the basis of the foregoing, the summary of the calculation of the value determined by the Commission is as follows:

| | |
|---|---|
| Visitation | 136,000 |
| Admission Fee | $3.00 |
| Gross Income | $408,000 |
| Expenses | $194,328 |
| Net Income | $213,672 |
| Capitalization Rate | 10% |
| Capitalized Value | $2,136,720 |
| Capital Expenditures | $421,225 |
| Value After Cap Expenses | $1,715,495 |
| Discount Rate/Adjustment | 10.714% |
| Value | $1,531,696 |
| | |
| Rounded Value | $1,535,000 |

## F. Conclusion

On the basis of the evidence in the record and for the reasons set forth above, the Commission determines that the "just compensation" for the 275.81 acres of land in fee simple, including oil and gas rights and including eight acres of coal, located in Stoneycreek Township, Somerset County, Pennsylvania, that was acquired by the United States of America under its constitutional power of eminent domain on September 2, 2009 is $1,535,000.00.

By the Commission:

James C. McLean Esquire

Paul D. Griffith, MAI, CRE, FRICS

Mark R. Shonberg, MAI

Dated: December 5, 2013

#9683660